2000 UT 26

**PRICE DEVELOPMENT COMPANY, Limited Partnership; John Doe; and Jane Doe, individuals, Plaintiff and Appellant,**

v.

**OREM CITY, a municipal corporation and political subdivision of the State of Utah; University Mall Shopping Center, a Utah general partnership; Woodbury Corporation, a Utah corporation; Zion's Cooperative Mercantile Institution, a**

**Utah Corporation; Joseph C. Andersen; Judy Bell; Steven Heinz; Joseph A. Nelson; David K. Palfreyman; Bill Peperone; Mike Thompson; Orem City Council; and John Does I through V, Defendants and Appellees.**

No. 990145.

Supreme Court of Utah.

Jan. 28, 2000.

---

1238

Michael W. Homer, Jesse C. Trentadue, Salt Lake City, for plaintiff.

James S. Jardine, Cameron M. Hancock, Salt Lake City, for defendant.

Zions Cooperative Mercantile Institution, Jody K. Burnett, George A. Hunt, Salt Lake City for defendants City of Orem.

Orem City Council and individually named City officials, Nicholas E. Hales, Reid W. Lambert, Salt Lake City for defendant University Mall Shopping Center and Woodbury Corporation.

Mark T. Ethington, Murray, for amicus Utah Taxpayers Association.

Roger F. Cutler, Boyd A. Ferguson, Salt Lake City, for amicus Salt Lake City Corporation.

ZIMMERMAN, Justice:

¶ 1   This case arises out of certain agreements between the defendant-appellees City of Orem, Utah (the "City"); the Woodbury Corporation ("Woodbury"), which owns the University Mall in Orem; and Zions Cooperative Mercantile Institution ("Z.C.M.I."), referred to collectively as "the Orem City defendants." Under the agreements, the City agrees to provide certain financial incentives to Woodbury and Z.C.M.I. to remain in the University Mall and refurbish its store and to Woodbury to expand the University Mall and bring in a new major tenant. The plaintiff-appellant, Price Development Corporation ("Price"), is the developer of a new mall in the neighboring community of Provo, Utah. Price has appealed a final decision of the trial court granting the Orem City defendants' motion for a partial summary judgment, and dismissing Price's challenge to the lawfulness of the agreements. Before us, Price contends, in summary, that: (i) the Utah Neighborhood Development Act (the "Development Act") preempts the field and preempts any local economic development ordinances; (ii) if the Development Act does not preempt the ordinances authorizing the challenged agreements, then the agreements run afoul of various Utah constitutional and statutory provisions governing the collection and expenditures of the sales and use tax and barring the disbursement of public monies without adequate consideration; and (iii) the trial court erred when it denied Price's rule 56(f) motion for additional time to respond to the summary judgment motions. We affirm in part and reverse and remand in part.

¶ 2   We first state the facts in the light most favorable to Price, the party opposing summary judgment. *See Wilkinson v. Union Pac. R.R. Co.*, 975 P.2d 464, 465 (Utah 1998). The University Mall has been located in Orem City since 1973. In 1997, J.C. Penney, one of the three anchor tenants at the University Mall, announced that it was moving its store to Provo City, Utah. Also in 1997, Z.C.M.I. announced that due to financial incentives, it was considering a similar move. Responding to the prospect of losing two major department store tenants, the City and Woodbury discussed the possibility of the City's providing financial incentives that would persuade Z.C.M.I. to stay in Orem, and would attract another large department store to take the place of J.C. Penney.

¶ 3   On April 28, 1998, a formal incentive proposal in the form of a series of agreements between the City, Z.C.M.I., and Woodbury, was presented to the Orem City Council at a public hearing. At this hearing, James Reams, Orem City Manager, gave a presentation to explain the financial consequences of Z.C.M.I.'s presence at the University Mall, as well as the consequences of obtaining another anchor store for the University Mall. He then described the terms of the agreement and recommended that the City Council approve the incentive proposal. Public comments were then heard, both opposing and supporting the proposal. The Orem City Council members voiced their opinions about the incentive proposal, and then voted in favor of the two ordinances, O–98–0021 and O–98–0022, which authorize the mayor to sign the incentive plan agreements.

¶ 4   The stated purpose of the financial incentive plan and the two authorizing ordinances is to preserve the sales tax base represented by the University Mall. The City relies heavily on this sales tax revenue and without it, the City would be forced to raise taxes. The University Mall needs renovation to compete successfully with new merchandising areas in other nearby cities. The City was persuaded that through financial incentives to retailers and physical improvements to the University Mall, it could sustain and improve the economic vitality of the University Mall and the surrounding shopping corridor. The first agreement in the package, No. A–98–0065, (the "Z.C.M.I. Agreement"), is designed to ensure Z.C.M.I.'s continued presence at the University Mall. Under this agreement, Z.C.M.I. promises to stay at the University Mall for 20 years, or at least as long as Nordstrom agrees to begin and continue operations at the University Mall. Z.C.M.I. also agrees to spend at least five million dollars to remodel its University Mall store. Woodbury agrees to purchase J.C. Penney's University Mall building, make ten

million dollars in improvements to the University Mall, and pay Z.C.M.I. $75,000 annually for ten years, or until Nordstrom or another mainstream department store opens at the University Mall. Finally, the City agrees to pay Z.C.M.I. two million dollars, one million to be paid when the remodeling of Z.C.M.I. begins, and the second million when Z.C.M.I. proves that it has expended at least two and a half million dollars on the remodeling of the store. Furthermore, the city agrees to pay Z.C.M.I. $20,833 per month for ten years, or until either Nordstrom opens at the University Mall or Z.C.M.I.'s annual sales exceed thirty million dollars. Should a department store other than Nordstrom open at the University Mall, the payment is to be reduced to $8,333 per month. The City also agrees to pay $50,000 per year to Woodbury for a marketing campaign to promote the University Mall and shopping in Orem. The City's obligation to make payments to Z.C.M.I. over the years is subject to reappropriation by every subsequent City Council. Finally, if Z.C.M.I. does not operate at the University Mall for the entire twenty year term of the agreement, it must reimburse the City and Woodbury for all amounts paid to it under the agreement. And, if Z.C.M.I. does not complete the agreed-upon improvements, it must reimburse the City for any of the two million dollars it has received from the City, plus interest. Should Woodbury fail to complete the required improvements to the University Mall, Woodbury must pay the City's obligations to Z.C.M.I. and the City is freed from any further obligations to Woodbury.

¶ 5 The second agreement in the package is No. A–98–0066, (the "Nordstrom Agreement"). This is designed to induce Nordstrom to locate at the University Mall. Under this agreement, Woodbury is to take steps necessary to bring Nordstrom to the University Mall, and undertakes to complete a re-modeling and expansion of the University Mall. Once a Nordstrom store is in place at the University Mall, the City will convey eleven parcels of land to Woodbury, valued at two million dollars, and make twenty annual payments of up to $975,000 a year to Woodbury, measured by increased University Mall sales tax revenue.[1] Each subsequent City Council has the right to refuse to appropriate further money for this project. If Woodbury fails to bring Nordstrom to the University Mall before December 31, 2001, and fails to remodel or expand the University Mall as agreed, the City will have no obligation to convey the property or make any payments. The City's obligation to continue to make payments to Woodbury is contingent upon Nordstrom staying at the University Mall. If Nordstrom comes to the University Mall but then leaves before the end of the twenty year term and the City's obligation to make payments is terminated, the City has no right to reimbursement of any previous payments made to Woodbury.

¶ 6 According to the legislative record presented to the district court, the Council had various financial data which it considered in coming to its decision to enter into these agreements. These data included: (i) an analysis supplied by Woodbury relating to the possible loss of revenue if Z.C.M.I. moved from the University Mall, possible revenue increases if a new department store was attracted to the mall, and an estimate of possible future mall expenditures; (ii) a projection of the potential losses if Z.C.M.I. leaves and the potential increases if Z.C.M.I. remains and another department store moves in, plus a spreadsheet of Woodbury's and the City's financial obligations under the agreement; (iii) an estimate of the sales tax increase from the University Mall under the different possible scenarios; and (iv) a resolution of the Commission for Economic De-

---

1. The payment schedule for these twenty annual payments begins with the creation of a Base Year, which is the twelve months prior to the opening of the Nordstrom store. Once the Nordstrom store opens, then every fiscal year is calculated from that original base year. The annual payment shall be measured by "the amount that the sales tax generated by University Mall during a given Payment Year exceeds the sales tax generated by University Mall during the Base Year" up to $975,000 per year. If the sales tax revenue from the University Mall for any given year does not exceed the base year tax revenue, the City is not required to make a payment to Woodbury for that year. Furthermore, the amount of any annual payment shall be decreased dollar for dollar if Woodbury does not spend the specified amounts for bringing Nordstrom to the University Mall, or for the remodeling and expansion.

velopment in Orem supporting these financial incentives.

¶ 7 In May of 1998, a group entitled People for Fair Taxation filed a lawsuit against the Orem City defendants.[2] After many of the plaintiffs who comprised the People for Fair Taxation were notified that the suit was being sponsored by Price, a developer of a new Provo mall, and not by other small businesses, they requested that their names be removed from the lawsuit. The complaint was amended and Price was left as the sole plaintiff in this action. Price asserted several claims below. First, it argued that the Development Act preempts the entire field of local economic development. *See* Utah Code Ann. §§ 17A–2–1201 to –1264 (1999). Since the Orem City defendants did not comply with the Development Act, Price contended the ordinances were illegal. Second, Price contended that the agreements amounted to a non-uniform collection of sales tax, in violation of article XIII, section 2 of the Utah Constitution, and that because the ordinances and agreements attempted to grant an exemption from sales tax, they violate the Utah Local Sales and Use Tax Act. *See* Utah Code Ann. §§ 59–12–201 to –210 (1996 & Supp.1999). Third, Price argued that the agreements required the City to make unlawful and unconstitutional gifts of public funds and property, in violation of article XI, section 5 of the Utah Constitution and section 10–8–2 of the Utah Code. Fourth, Price asserted that the agreements were an unconstitutional incurrence of debt in excess of annual revenue, in violation of article XIV, section 3 of the Utah Constitution. And finally, Price averred that the agreements amounted to an improper restraint of trade. The Orem City defendants filed a motion for partial summary judgment on all but the restraint of trade claim. Price responded by filing a cross-motion for partial summary judgment. Price also filed a Rule 56(f) affidavit and motion requesting a continuance to complete discovery before the court ruled on the motions for partial summary judgment.

¶ 8 The trial judge issued a partial summary judgment and order in favor of the Orem City defendants and denied Price's cross-motion for partial summary judgment.[3] The trial judge also denied Price's rule 56(f) motion. Specifically, the trial court held that the Development Act "does not preempt separate actions by municipalities that are otherwise in accordance with the law." The trial court also ruled that there was no unlawful gift of money in violation of article VI, section 5 of the Utah Constitution; future city councils were not wrongfully bound; no debt was incurred in excess of tax revenues in violation of article XIV, section 3; and there was no non-uniform collection of property tax in violation of article XIII, section 2. The rule 56(f) motion was denied because all of the issues presented were questions of law, and based on the legislative record, no further discovery was considered necessary. This appeal followed.

¶ 9 Before this court, Price raises all the legal claims made below, and also asserts that the trial court erred in denying the motion for a continuance. We state the standard of review before turning to our analysis. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(c). In reviewing a summary judgment, we accord no deference to the trial court and review its ruling for correctness. *See Johnson v. Redevelopment Agency of Salt Lake County*, 913 P.2d 723, 727 (Utah 1995); *K & T, Inc. v. Koroulis*, 888 P.2d 623, 627 (Utah 1994). As for the trial court's rule 56(f) ruling, we review it under an abuse of discretion standard: Does the grant or denial exceed "the limits of reasonability." *Crossland Sav. v. Hatch*, 877 P.2d 1241, 1243

---

2. The parties which comprised People for Fair Taxation were: Roger Mortensen d/b/a Hobby Stop; Computer Recyclers, Inc.; Price Development Co.; Heringer Marine; Cesar Tavares d/b/a Video Care; Greg Morgan d/b/a Orem Vacuum; and John and Jane Doe.

3. All of Price's claims were dismissed with prejudice, except for the restraint of trade claim. This claim was not part of the Orem City defendants' partial summary judgment motion and therefore was not before the trial judge. After the partial summary judgment was issued, the parties stipulated to dismissal of the restraint of trade claim, and the court dismissed this last cause of action.

(Utah 1994) (quoting *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993)).

¶ 10   When reviewing a local government action, we give local government great latitude in creating solutions to the many challenges it faces, unless the action "is arbitrary, or is directly prohibited by, or is inconsistent with the policy of, the state or federal laws or the constitution of [Utah] or of the United States." *State v. Hutchinson*, 624 P.2d 1116, 1126 (Utah 1980). The question before us today is whether Orem City, in acting on its perfectly understandable impulse to retain and enlarge its sales tax revenues, used means that exceeded its constitutional or statutory powers. We address Price's various claims in order.

¶ 11   Price first asserts that the Development Act preempts the area of local economic development legislation and provides the only means by which a local government can engage in economic development and, because the Development Act's detailed substantive and procedural safeguards were not complied with, the ordinances in question are illegal and the agreements they authorize void. We first set out the preemption analytical model and then apply it to the Development Act.

¶ 12   We have held that "an ordinance is invalid if it intrudes into an area which the Legislature has preempted by comprehensive legislation intended to blanket a particular field." *State v. Hutchinson*, 624 P.2d at 1121; *see also Redwood Gym v. Salt Lake County Comm'n*, 624 P.2d 1138, 1144 (Utah 1981) ("[L]ocal governments may legislate by ordinance in areas previously dealt with by state legislation, provided the ordinance in no way conflicts with existing state law."). Utah case law has addressed preemption several times, but we have not developed a detailed analytical model for determining preemptive intent. We therefore find it useful to look to the United States Supreme Court which over the years has developed a helpful preemption model in the context of addressing the circumstances under which a federal statute preempts a state or local statute or ordinance. We find this same test helpful when addressing state law preemption, as where it is asserted that a state statute preempts a local governmental act or the common law.

This analytical model was recently stated as follows:

[i] Sometimes courts, when facing the pre-emption question, find language in the ... statute that reveals an explicit [legislative] intent to pre-empt [local] law. [ii] More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the ... statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. [a] A ... statute, for example, may create a scheme of [statutory] regulation "so pervasive as to make reasonable the inference that [the Legislature] left no room for the [local law] to supplement it." [b] Alternatively, [statutory] law may be in "irreconcilable conflict" with [the local] law. Compliance with both ..., for example, may be a "physical impossibility," or, [c] the [local] law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature]."

*Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (bracketed material added) (citations omitted); *see also Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

¶ 13   To determine if the legislature intended to preempt the entire field of economic development, we first turn to the plain language of the statute. *See Barnett Bank*, 517 U.S. at 31, 116 S.Ct. 1103. If there is no declaration of preemptive intent, we then consider the statute as a whole in the context within which it operates. *See id.; see also Business Aviation of South Dakota, Inc. v. Medivest, Inc.*, 882 P.2d 662, 665–66 (Utah 1994) (holding that statutory language must be read in the context of the complete act); *Osuala v. Aetna Life & Cas.*, 608 P.2d 242, 243 (Utah 1980) (holding that where provisions of an act are ambiguous, court must analyze act in its entirety).

¶ 14   We agree with the trial court's conclusion that there are no provisions within

the Development Act which specifically preempt the entire field of economic planning. On the other hand, there is no language denying preemption.[4] We therefore must look to the Development Act and its operation to determine whether its "structure and purpose" reveal a preemptive intent. *Barnett Bank,* 517 U.S. at 31, 116 S.Ct. 1103.

¶ 15 The Development Act was described in our opinion in *Johnson v. Redevelopment Agency of Salt Lake County,* 913 P.2d 723 (Utah 1995). The Development Act's purpose is the economic redevelopment of blighted areas. Because a redevelopment agency has the right to use property tax increments from the redevelopment property for its own purposes, and has the power to condemn blighted property, its operation is heavily freighted with substantive and procedural safeguards to protect property owners in the area and other affected governmental agencies reliant on the property tax. *See id.* at 725; *see also* Utah Code Ann. §§ 17A–2–1208 to –1215 (1999). An analysis of the detailed provisions of the Development Act leads to the conclusion that if a local government wishes to exercise the extraordinary powers of eminent domain or tax increment financing to redevelop a blighted area, it would have to follow the Development Act's requirements. But there is little in the elaborate structure of the Development Act that suggests it has any operative effect where general economic development is the issue and the government does not seek to use condemnation or tax-increment financing powers to accomplish it. Looking at the *Barnett Bank* test, it seems clear that the Development Act does not cover the entire field of local economic development, leaving no room for a local government to make law.

We held in *Johnson,* that "[t]he purpose behind redevelopment legislation is the alleviation of blight." *Johnson,* 913 P.2d at 730. There is no suggestion that the Development Act was created to entirely control a community's ability to face economic challenges. We find that the objectives of the Development Act and the local financial incentive plans to be clearly different because the Development Act seeks to provide specific extraordinary and potentially coercive mechanisms to alleviate blight and create new jobs, while the City's ordinances provide only local economic incentives to growth. Finally, the local policy does not create a result that is inconsistent with the objectives of the state statute. The City's incentive plan was designed to sustain the sales tax base of Orem. This does not conflict with the objectives of the Development Act. Therefore, we conclude that the trial court was correct in holding that the structure and purpose of the Development Act display no intent to preempt the ordinances at issue.

¶ 16 Price's second argument is that the challenged agreements operate to give illegal tax rebates or exemptions to Z.C.M.I. and Woodbury which violate article XIII, section 2 of the Utah Constitution, and the Local Sales and Use Tax Act, Utah Code Ann. §§ 59–12–201 to –210 (1996 & Supp.1999). Although raised below, the trial court did not address this issue in its summary judgment order.

¶ 17 We first examine the constitutional provision. Article XIII, section 2 of the Utah Constitution states: "All tangible property in the state, not exempt under the laws of the United States, or under [the Utah] Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law."

---

4. Section 17A–2–1242 of the Code provides:
   > It is the intent of the legislature that the rights, duties, responsibilities, and authority granted under the Utah Community Redevelopment Law shall in no way be diminished, restricted, abolished, or in any way impaired by this part nor that the rights, duties, responsibilities, and authority of any government unit be diminished, restricted, or impaired in utilizing the benefits of this part.

   Utah Code Ann. § 17A–2–1242 (1999).

   Although the trial court concluded that this language displayed an intent not to preempt, we find it of no assistance here. This section only provides that when the Development Act is being utilized, it should not encroach on any rights or powers of a governmental entity granted under another specified statute. *See id.* The issue before us was not whether the use of the Development Act is an invasion of governmental rights, but rather the scope and applicability of the Development Act itself. Since this provision gives no guidance as to the applicability of the Development Act, we find it to be irrelevant to our discussion.

Utah Const. art. XIII, § 2. Price argues that these agreements, by returning certain amounts of sales tax revenues to the store and University Mall owners, amount to an effective reduction of their property tax rates. We find no merit to this argument. Reading the plain language of the constitutional provision, it only requires a uniform and equally applied property tax assessment. It says nothing about sales taxes. And it certainly places no restrictions on how sales tax revenues are spent once they are received by a municipality. We find no constitutionally relevant connection between the spending of sales tax revenues and the requirement of a uniform property tax.

¶ 18 Price's next rebate or exemption argument is that the agreements at issue amount to the grant of an illegal sales and use tax exemption to Z.C.M.I. and the University Mall owners, in violation of the Local Sales and Use Tax Act. *See* Utah Code Ann. §§ 59–12–201 to –210 (1996 & Supp.1999). Essentially, Price argues that because the agreements send dollars back to the retailers measured by the increases in sales tax revenue, their economic effect is to grant what amounts to a sales tax exemption. Price relies on *Mountain States Telephone & Telegraph Co. v. Ogden City*, 26 Utah 2d 190, 487 P.2d 849 (1971), to support its position. That case holds that a city has no power to exempt a person or corporation from paying sales or use taxes unless it acts under a specific grant of legislative authority, and here the City claims no such grant of authority. *See id.* at 850. We find this argument unpersuasive.

¶ 19 In *Mountain States Telephone*, Ogden City enacted an ordinance under which certain franchisees would pay two percent of their gross revenue to Ogden City "in lieu" of all other taxes each franchisee might owe. *See id.* at 849. We observed that cities "can exercise no power except that granted" to them, and we found no provision in the constitution or in statutes which could "give a municipality the power to barter away its power to raise revenue by taxation." *Id.* Therefore, we found that Ogden City was acting beyond its powers. *See id.* That case has no application here. First, our subsequent decision in *Hutchinson,* where we held that we will give local government much latitude in creating solutions to problems, explicitly rejects the much stricter Dillon Rule standard of scrutiny over local government powers that we had employed in *Mountain States Telephone.* *See Hutchinson,* 624 P.2d at 1126.[5]

¶ 20 Second, and perhaps more pertinent, as we observed in *Municipal Building Authority v. Lowder,* 711 P.2d 273 (Utah 1985), when it comes to financing public projects, the fact that a local unit of government is attempting to do indirectly what it may not do directly in no way taints the effort. *See id.* at 280. Local governments must abide by the explicit limitations the constitution and statutes place on their financing schemes, but if they can find an alternative permissible way to achieve the same end, we will not stand in their way. *See id.* ("If the express terms of an enactment do not offend the constitution, its purpose alone will not render it unconstitutional. And nothing prohibits local governments from lawfully avoiding these constitutional limitations.").

¶ 21 Here, the agreements do not purport to reduce the sales taxes to be paid to Orem City. Rather, the City has simply agreed that it will pay certain amounts to Woodbury and Z.C.M.I., which amounts are fixed by reference to the increased sales tax revenue Orem receives over and above the pre-renovation base year, and which amounts are capped at an upper figure. But it has not agreed to forgo any collection of taxes, precisely what Ogden City did agree to do and which ran afoul of the constitution in the *Mountain States Telephone* case. For that reason, we find these agreements do not violate article XIII, section 2.

¶ 22 Price's next Sales and Use Tax Act challenge is that the expenditures being made are not an authorized use of the sales and use tax revenue. This argument is based on section 59–12–202 of the Code, one of the opening provisions of the Local Sales and Use Tax Act. That section provides in relevant part: "It is the legislative intent

---

5. The Dillon Rule "requires strict construction of delegated powers to local governments." *Hutchinson,* 624 P.2d at 1118. For a historical perspective of the application of the Dillon Rule in Utah, see *Hutchinson* generally.

that this added revenue [from the sales and use tax] be used to the greatest possible extent by the counties, cities, and towns to finance their capital outlay requirements and to service their bonded indebtedness." Utah Code Ann. § 59–12–202 (1996). Because the expenditures to be made by Orem under the agreements are not for "capital outlay requirements" or "to service their bonded indebtedness," Price argues that they are beyond the reach of the City's power.

¶ 23 To determine whether this language amounts to a statutory limitation on the uses to which sales and use tax revenue can be put, we consider its context within the Local Sales and Use Tax Act. We have referred to a statement of legislative purpose as a "preamble" to the operative provisions of a statute. *See De Baritault v. Salt Lake City Corp.*, 913 P.2d 743, 745 (Utah 1996); *Crawford v. Tilley*, 780 P.2d 1248, 1250 (Utah 1989). And we have held that as such, a preamble is nothing more than a statement of policy which confers no substantive rights. *See Westly v. Board of City Comm'rs*, 573 P.2d 1279, 1280 (Utah 1978). In *Westly*, section 34–19–1 of the Code, a section within the Labor Disputes Act, was described as a "declaration of policy." *Id.* We held that this declaration did not "constitute an enlargement of authority or power in excess of that contained in succeeding sections." *Id.* While some statutes have a policy section and some have a preamble, the effect to be given these provisions is the same: they provide guidance to the reader as to how the act should be enforced and interpreted, but they are not a substantive part of the statute. *See* Norman J. Singer, *Sutherland Statutory Construction* §§ 20.03, 20.12 (5th ed.1993). They may be used to clarify ambiguities, but they do not create rights that are not found within the statute, nor do they limit those actually given by the legislation. *See id.; De Baritault*, 913 P.2d at 747. Accordingly, we have

said that we will not limit our interpretation of a statute by reference to a "general declaration of purpose actuating the legislature in passing the Act." *Bird & Jex Co. v. Funk*, 96 Utah 450, 459, 85 P.2d 831, 835 (1939). Instead, we look to the statute as an operative whole in divining legislative intent. *See id.*

¶ 24 Here, there is no operative provision in the Local Sales and Use Tax Act which purports to limit in any way the uses to which local government may put the revenue it receives from a local sales tax. In specific response to Price's contention: there is no provision that a local government may only use its sales and use tax revenue for capital expenditures or to retire bonded indebtedness. *See* Utah Code Ann. §§ 59–12–204 to –205 (1996). Absent such a direct limitation, we treat section 59–12–202 only as a non-binding statement of legislative preference. Therefore, we hold that the use by Orem City of sales and use tax revenues to fund the agreements in question does not violate the Local Sales and Use Tax Act.

¶ 25 Price's final challenge is the contention that Orem's required expenditures under the agreements are not supported by adequate consideration flowing to the City and, therefore, amount to an illegal gift of public money and property, all in violation of article XI, section 5 of the Utah Constitution, section 10–8–2 of the Code, and our prior holdings in *Salt Lake County Commission v. Salt Lake County Attorney*, 985 P.2d 899 (Utah 1999); *Lowder*, 711 P.2d 273; and *Sears v. Ogden City*, 533 P.2d 118 (Utah 1975), *aff'd on rehearing*, 537 P.2d 1029 (Utah 1975).

¶ 26 We elaborate the legal reasoning underlying Price's position. Article XI, section 5 of the Utah Constitution describes the powers "to be conferred upon the cities."[6] Price notes that nothing within this section grants cities the power to make a gift of public funds. Section 10–8–2 of the Code,

---

6. Article XI, Section 5 states in relevant part:

The power to be conferred upon the cities by this section shall include the following:
    (a) To levy, assess and collect taxes and borrow money, within the limits prescribed by general law, and to levy and collect special assessments for benefits conferred.
    (b) To furnish all local public services, to purchase, hire, construct, own, maintain and operate, or lease, public utilities local in extent

and use; to acquire by condemnation, or otherwise, within or without the corporate limits, property necessary for any such purposes, subject to restrictions imposed by general law for the protection of other communities; and to grant local public utility franchises and within its powers regulate the exercise thereof.
    (c) To make local public improvements and to acquire by condemnation, or otherwise, property within its corporate limits necessary for such improvements; and also to acquire an

in which the legislature conferred the general power of appropriation on city governing bodies, provides that they may appropriate money for "corporate purposes only," and those are defined as "any purpose that ... provides for the safety, health, prosperity, moral well-being, peace, order, comfort, or convenience of the inhabitants of the city." Utah Code Ann. § 10–8–2(1)(a), (2) (1999). Again, there is no provision within section 10–8–2 which allows a city to give away public money. And this court has held that although this section is silent on the subject of necessary consideration for any appropriation, in fact, public property is held in trust for the public and may not be disposed of other than "in good faith and for adequate consideration." *Sears*, 533 P.2d at 119; *accord Lowder*, 711 P.2d at 282; *Salt Lake County*, 985 P.2d at 909–10. "Adequate consideration" means that the local government must show that there is a clear "present benefit that reflects ... fair market value" for whatever is given by the local government. *Id.* at 910 (quoting *Lowder*, 711 P.2d at 282). A future benefit will not suffice, nor will a benefit that is of uncertain value. *See Lowder*, 711 P.2d at 282. Price argues that the benefits under the agreements do not meet this standard as a matter of law. Alternatively, Price contends that there is a factual issue as to the exchanged values that should have defeated a summary judgment, or, at a minimum, resulted in a grant of the motion for continuance for more discovery.

¶ 27 The above statement of the law underlying Price's position is a correct one. For any disposition of public money or

property to pass legal muster, it must be shown that the public entity has received fair market value in exchange, and, in a transaction, each year's exchange must meet that standard independent of every other year. It is not enough that the entire agreement can be said to be a fair exchange. While we do generally accord local government latitude in deciding how to perform its functions, *see Lowder*, 711 P.2d at 277; *Hutchinson*, 624 P.2d at 1126, we are not free to ignore the technical requirements of the constitution and statutes. This requirement of an evaluation that examines each year of the exchange is a direct result of the interplay of article XIV, section 3 of the constitution and the "good faith and ... adequate consideration" gloss *Sears* placed on section 10–8–2, and *Lowder* extended to sections 17–4–3 and 17–5–48. *See Sears*, 533 P.2d at 119; *Lowder*, 711 P.2d at 282.

¶ 28 In granting a summary judgment to the Orem City defendants, the trial court held as a matter of law that benefits flowed to the City under the agreements and, therefore, that there was adequate consideration for the transfer of money and property. The court presumably based this determination on the legislative record submitted by the City that contained various analyses of the values exchanged under this complicated transaction. However, the court did not address whether, in each of the twenty years' exchanges of value between the City and the University Mall defendants called for by the agreements, the City received fair market value for what it gave.[7] This oversight fundamentally undermines the trial court's sum-

---

excess over than [that] needed for any such improvement and to sell or lease such excess property with restrictions, in order to protect and preserve the improvement.

(d) To issue and sell bonds on the security of any such excess property, or of any public utility owned by the city, or of the revenues thereof, or both, including, in the case of public utility, a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate such utility.

Utah Const. art. XI, § 5 (alteration in original).

7. The Orem City defendants appear to have failed to address this requirement in briefing before the trial court, and as an apparent consequence, the trial court failed to consider this essential analytical element in ruling on the summary judgment motion. It appears that those who drafted the agreements were well aware

that to avoid the operation of article XIV, section 3, the agreements could not commit the City to spend more than the current tax revenues. Hence, the agreements contain a provision that states "the City's obligation to make payments ... shall be subject to annual appropriation by the Orem City Council." This is necessary to prevent the obligations under the agreements from becoming a debt that must be submitted to the voters. *See Lowder*, 711 P.2d at 278–79, 282. A parallel provision in the agreements provides that both Z.C.M.I. and Woodbury accept the risk that the City may not be able to fulfill its obligations through the full term of the agreements for various reasons, including:

[f]ailure to make an annual appropriation, changes in sales tax rates, changes in the percentage of overall sales tax revenues that are allocated to cities, State of Utah legisla-

mary judgment on this point, for such an analysis is necessary under statutory and case law if the exchanges are to be lawful. Absent such a finding, the summary judgment lacks a necessary factual and legal premise and must be vacated.[8]

¶ 29  In remanding, we make several observations that may be helpful to the trial court in dealing with the issues before it. *See* Utah R.App. P. 30(a); *see also Utah Farm Prod. Credit Ass'n v. Watts,* 737 P.2d 154, 158 (Utah 1987) ("When it is necessary to remand a case for further proceedings, it is the duty of the reviewing court to address matters which will necessarily arise at trial."); *Salt Lake County v. Salt Lake City,* 570 P.2d 119, 121 (Utah 1977) (same); *Le-Grand Johnson Corp. v. Peterson,* 18 Utah 2d 260, 420 P.2d 615, 617 (1966) (same).

¶ 30  First, we find meritorious Price's contention that the trial court abused its discretion in denying Price's rule 56(f) continuance during which it could complete discovery regarding the transaction.[9]  In the rule 56(f) affidavit, Price asserts that more discovery was needed to determine what Orem City expected "to receive as a result of [their] economic support," and whether this transaction was supported by adequate consideration.  The trial court ruled that the questions raised by the Orem City defendants' summary judgment motion were "purely matters of law to be based upon the

> tive enactments, judicial rulings, or any similar limitation or restriction on the City's ability to make payments.
>
> However, it is not clear whether the drafters considered the interplay of the annual appropriation requirement with the "good faith and adequate consideration" requirement of *Sears.*  This is an issue that must be explored on remand.

8.  In Price's reply brief on appeal, it suggests that an additional weakness in the agreements is that the increase in sales taxes labeled a benefit for the City from a revitalization of the University Mall is not really a fair measure of the net benefit received.  Price contends that much of the increased sales and use tax revenue will result from a shift in business from non-University Mall locations within Orem to the University Mall, and a shift in sales tax revenue point of sale sources cannot be counted as a benefit to the City as an entity.  We agree conceptually that a shift in tax revenue sources within the City cannot be counted as a net benefit to the City, but we leave it to the trial court to explore this issue further on remand.

legislative record of the Orem City Council."  We will review a trial court's grant or denial of a rule 56(f) motion under an abuse of discretion standard.  *See American Towers Owners Ass'n, Inc. v. CCI Mechanical, Inc.,* 930 P.2d 1182, 1195 (Utah 1996); *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994).  Furthermore, to provide an adequate opportunity for discovery, the trial court should liberally grant rule 56(f) motions unless they are "dilatory or lacking merit." *Crossland Sav.,* 877 P.2d at 1243; *Cox v. Winters,* 678 P.2d 311, 312–13 (Utah 1984).

¶ 31  In a very simple transaction a trial court might be able to conclude as a matter of law based on documentary evidence that an exchange was in "good faith and for an adequate consideration," *Sears,* 533 P.2d at 119, i.e., that the governmental unit "will receive ... present benefit that reflects the fair market value" of what is given.  *Lowder,* 711 P.2d at 282.  But in a multi-year, multi-party transaction with as many contingencies as this one, where a challenger attacks various aspects of the exchange, it is almost definitional that the fairness of each year's exchange values will present a disputed question of material fact not resolvable on summary judgment and warranting trial.  Therefore, we find that the trial court abused its discretion when it found that the only issues to be decided were "matters of law" to be based upon the legislative record.[10]

9.  Rule 56(f) of the Utah Rules of Civil Procedure states:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Utah R. Civ. P. 56(f).

10.  In *Cox,* we held that we will not grant a continuance when the moving party is going on a "fishing expedition" for more facts after substantial discovery, has not availed themselves of all discovery procedures, or if discovery procedures were timely initiated, they were not "afforded an appropriate response."  *Cox,* 678 P.2d at 314; *see also Downtown Athletic Club v. Horman,* 740 P.2d 275, 278 (Utah Ct.App.1987) (consolidating the factors set out in *Cox*), *cert. denied,* 765 P.2d 1277 (Utah 1987).  Here the trial court based its entire decision only on the legislative record.

¶ 32 Second, we think it useful to give some guidance as to how challenges such as these should be handled. We find a model for such guidance in our decisions dealing with the fixing of municipal fees for new real estate developments, *Banberry Development Corp. v. South Jordan City*, 631 P.2d 899 (Utah 1981) and *Home Builders Ass'n v. American Fork*, 973 P.2d 425 (Utah 1999). In those cases, we held that because of the legal constraints on the amount of such fees, local government must evaluate complex financial information, consider a multiplicity of factors, and establish a reasonable equivalence between the benefits received by the new real estate development and the fees to be paid to the local government. *See id.* at 430 ¶ 20. We also held that when this was done, the local legislative determination of a fee rate was entitled to a "presumption of constitutionality.". *Id.* at 427 ¶ 4 (quoting *Banberry*, 631 P.2d at 904). We stated that the local government has to disclose the basis for its decision to "whoever challenges the reasonableness of its subdivision or hookup fees." *Id.* The burden is then on the challenger to show that the fees did not meet the appropriate legal standard. *See id.*

¶ 33 This presumption commends itself to us for situations where a unit of government enters into a transaction subject to the constitutional and statutory requirements explained in *Sears* and *Lowder* of a fair value exchange. The processes followed by a local government unit in setting the fees addressed in *Banberry* and its progeny are similar in material respects to the process for determining whether a transaction results in a fair value exchange. In both cases, financial information must be amassed and analyzed; the governing body must make a legislative decision to set terms for a transaction; staff or other experts may be justifiably relied upon by the legislative body in determining that the economic data supports a conclusion that the relevant legal standard is met, *Home Builders*, 973 P.2d at 431; and, a court may be asked to set aside the transaction for failure to meet that standard. The legal standards are different—*Banberry* requires only a reasonableness determination,

while under *Sears* and *Lowder*, the determination must be that the exchange brings the government entity net fair market value—but the relative positions of the parties and the court are the same. In both instances, the court is reviewing the legislative action, and we think that in both, the legislative action deserves a presumption of propriety, but neither legislative judgment should be preclusive.

¶ 34 We therefore hold that when a legislative body enters into a transaction where public money or property is given in exchange for something, the good faith legislative judgment that the net exchange is for fair market value flowing to the entity needs to be supported by documentation within the legislative record of an independent determination of the value of the exchange. That information should be available to anyone seeking to review the transaction. In the event that the exchange so documented is challenged, a presumption of validity attaches to the valuation, and the burden of proving that it does not satisfy the relevant legal standards is upon the challenger. However, the challenger is not limited to the evidence in the legislative record in mounting the challenge to the fairness of the exchange. On remand, the trial court should apply this schema in determining Price's remaining challenges to the agreements.

¶ 35 We note for the benefit of the trial court, and for local government units considering transactions in the future, that in practice, the ability of a local government determination of a net fair value exchange to withstand attack will be in direct proportion to the thoroughness of the evaluation of the transaction entered into and to the independence and skill of the evaluators. For example, in the present case, if the information relied upon by the City in determining that the agreements met the relevant legal standards were all prepared by the private parties to the exchange, and were not independently analyzed by persons with sufficient legal and economic expertise to be able to

---

Other potential discovery material was found to be irrelevant. Since we conclude as a matter of law that basing the decision in this situation solely on the legislative record error, it is unnecessary for us to work through the analytical model we outlined in *Cox*.

make an informed judgment about the legal equivalence of the annual values exchanged, and who lacked the data necessary to make a solid appraisal of the net benefit to the City in each year of the agreements, then the presumption of validity that attaches to the transaction's valuation would be fragile at best. On the other hand, if the City had an independent analysis performed by qualified people, had before it all information necessary to appraise the real net economic benefits to the City from the transaction over time, and considered carefully the legal standards that the agreements had to meet, then the presumption of validity would amount to a serious obstacle to a challenger seeking to set the agreements aside. Local government units have it within their power to make such transactions relatively secure from challenge. It is all a question of how thoroughly and hard-headedly they review the values exchanged.

¶ 36  Courts have no interest in deterring creative municipal efforts to encourage economic development. At the same time, Utah's constitution and statutes must be satisfied, and they require that the public's money and property be carefully tended, lest public and political pressures persuade local government to transfer it into private hands without receiving a fair net benefit in exchange. Because the trial judge incorrectly held that, as a matter of law, the City received adequate consideration in the financial incentive agreements, we vacate the summary judgment and remand the matter for further proceedings consistent with this opinion.

¶ 37  Chief Justice HOWE, Justice RUSSON, Judge ORME and Judge LINDBERG concur in Justice ZIMMERMAN's opinion.

¶ 38  Having disqualified themselves, Associate Chief Justice DURHAM and Justice STEWART do not participate herein. Court of Appeals Judge GREGORY K. ORME and District Judge DENISE P. LINDBERG sat.