2004 UT App 135

**DIAMOND B–Y RANCHES,**
**Plaintiff and Appellant,**

v.

**TOOELE COUNTY, Defendant**
**and Appellee.**

No. 20030578–CA.

Court of Appeals of Utah.

April 29, 2004.

842

Allen K. Young, Young, Kester & Petro, Provo, and Jonah Orlofsky, Chicago, Illinois, for Appellant.

Jody K. Burnett, Williams & Hunt, Salt Lake City, and Douglas J. Ahlstrom, Tooele, for Appellee.

Before Judges JACKSON, ORME, and THORNE.

## OPINION

ORME, Judge:

¶ 1 Diamond B–Y Ranches asserts that it is entitled to compensation under federal and state "taking" jurisprudence because Tooele County's denial of Diamond's request for a conditional use permit to operate a gravel pit rendered its property valueless. The trial court granted summary judgment in favor of the County based on its determination that Diamond had no protected property interest in the permit and did not provide sufficient evidence to allow approval of the permit. We reverse and remand.

## BACKGROUND

¶ 2 Diamond owns over 190 acres of land in Tooele County, approximately one third of which is within the northern boundary of the town of Stockton. The property has historically been used to operate a gravel pit, and Diamond purchased it either to conduct its own gravel pit operation or to sell it to a gravel extraction company. The nearest residential subdivision is a quarter mile from the southern boundary of the property. Within the property is a substantial portion of a unique geologic formation known as the Stockton Bar, which is a sediment deposit that is approximately 100 feet high and runs for several miles through the property.

¶ 3 In May 2000, Diamond contracted to sell the property to Geneva Rock Products, Inc. for six million dollars. At that time, the property was zoned such that mining and related activities, including the operation of a gravel pit, were among the activities designated as conditional uses for the property. The offer was therefore conditioned on Geneva obtaining a permit to operate a gravel pit, concrete batch plant, and asphalt hot plant on the property. On July 12, 2000, Geneva submitted its application to the County for a permit to conduct such activities on the property.

¶ 4 The application for a conditional use permit was reviewed by the Tooele County Planning Commission at a public hearing on July 19, one week after it was submitted. The Planning Commission expressed concerns about (1) negative impacts to residents, given the property's close proximity to Stockton and (2) the destructive impact that an extraction operation would have on the Stockton Bar itself. Several citizens, including the mayor of Stockton, voiced their opinions at the meeting, primarily raising concerns about pollution and health problems that would result from a gravel pit operating next to a residential area. With regard to the Stockton Bar, the University of Utah had presented information describing the bar as

an important "geoantiquity,"[1] graduate students had "identified a potentially endangered species of plant that grows there," and the County Engineer was concerned that "mining through the bar could disrupt the bar's function as an air dam between Tooele and Rush valleys." The Planning Commission decided to "table the application until the County receives an Environmental Impact Statement (EIS) that fully explores every potential impact of this operation [and that t]he EIS shall be conducted at. [Diamond]'s expense by an independent firm of the County's choosing." A representative of Geneva indicated that Geneva "will be willing to get and pay for the study"; that "he was not aware of the concerns of the public"; that "they have encountered some other complications besides this"; and that "they will review what has been presented and could walk away from the project." In light of the extensive opposition to the proposal, a member of the Commission "stated that she wants to let Geneva Rock know that they will have an uphill battle if the applicant proceeds."

¶ 5 Geneva's uphill battle became even more rigorous—or was at least temporarily delayed—the very next day. In order to re-evaluate its overall policy regarding extraction operations, the County instituted a six-month moratorium on July 20, 2000, postponing consideration regarding any request for a conditional use permit to operate a gravel pit. Geneva did not further pursue the permit, and assigned its application to Diamond one week before the moratorium expired. When the moratorium expired on January 23, 2001, the County enacted an ordinance, which created a new "mining, quarry, sand and gravel excavation zone" and removed all mining activities from the list of uses conditionally permitted in the previous multiple use zoning district. Diamond's property was not included among the areas eventually designated for extraction activities under the new zoning ordinance, but because the original application predated the zoning change, Diamond was allowed to continue to pursue the application under the previous ordinance. On January 24, 2001, Diamond "wrote the County Engineer[,] requesting that: (1) it continue to consider the pending Application on a grandfathered basis under the old zoning ordinance, because it was submitted before the ordinance was modified, and in the alternative, (2) that the County consider re-zoning Plaintiff's property to the new ... zoning classification."

¶ 6 The Planning Commission next met on February 7, 2001, to discuss Diamond's pending application under the prior ordinance. Once again, members of the Planning Commission and the public registered their concerns with the application. Diamond's attorney, who attended the meeting, responded to those concerns by asserting that "it is their right to mine their property"; "[t]hey are willing to work with the community and be good neighbors"; and "[t]hey are willing to meet any reasonable request by the commission." The Planning Commission, once again faced with several members of the community speaking in opposition to the proposal, "decided to table this item until an EIS is obtained by a company agreeable [to] both the county and the land owners."

¶ 7 On March 21, 2001, the Planning Commission reconvened to consider the alternative request made by Diamond, namely "that the County consider re-zoning Plaintiff's property to the new ... zoning classification." The Planning Commission evidently determined that Diamond's property was not an appropriate location for extraction operations and recommended that the Tooele County Board of Commissioners deny the request to rezone. Among other things—all of which relate to concerns for the health and welfare of the citizens of Stockton and preservation of the Stockton Bar—this recommendation was based on the following: the Stockton Bar's status as a "geoantiquity"; the possibility that "mining through the bar could disrupt the bar's function as an air

1. As reported by staff of the Commission, Dr. Margie Chan of the University of Utah explained that

> geoantiquities are natural deposits and landscapes that record Earth's history of the geologically recent past.... There are no other Great Ice. Age lake deposits like the Great Bar at Stockton, Utah as it is the largest with thousands of years of record [of the] history of major drastic climate changes into and out of an Ice Age.

dam"; the mayor's suggestion "that there would be many [e]nvironmental impacts on the community"; the close proximity to an "existing residential development"; and "the odors of the asphalt operation and fugitive dust." Over the next two months, the County Commission held three hearings in which the same concerns regarding negative impacts to the Stockton Bar and the surrounding community were echoed. On May 22, 2001, the County Commission denied Diamond's request to have its property included in the new zone that permitted mining and extraction activities.

¶ 8 Diamond continued to pursue the application under the prior ordinance and requested bids from seven engineering firms that had been approved by the Planning Commission to provide an EIS. Only two of those firms responded, and neither offered to perform all of the services that had been requested by the Planning Commission. Both firms "proposed significant limitations on the scope of their work," and the lowest bid "was in excess of $100,000, with the work to be completed in nine months." On June 11, 2001, Diamond's attorney sent a letter to the Planning Commission explaining that "such a bid, particularly in light of the limitations of the work to be achieved, and the strong public opposition to any mining to be allowed in the area, makes the bid cost prohibitive." Diamond explained that it "would be agreeable to the same conditions imposed on" three similar gravel extraction operations that were granted permits in 2000, "including binding plans of reclamation, and air and water quality requirements," but that Diamond "has concluded that going forward with the full EIS, in light of the cost and public opposition, would be futile."

¶ 9 The Planning Commission met again on July 18, 2001, to consider Diamond's application under the previous ordinance. Diamond's attorney attended the meeting and stated that Diamond is "willing and prepared to be bound by all restrictions that were imposed" on other gravel pits. Nonetheless, citing the same concerns as it had in the previous meetings, the Planning Commission recommended once again that the application be denied. On September 18, 2001, the County Commission voted 2–1 to deny the permit. The two commissioners that voted to deny the permit reasoned that "the health and safety of the citizens of Stockton can be in danger if that type of thing is put within that short of distance of the housing" and that "there are other uses for this type of property." The commissioner that voted to grant the permit thought that "this is not an environmental hazard and it's a good logical place ... and ought to be used for what it is most valuable for."

¶ 10 Diamond filed a complaint on October 15, 2001, alleging that the County's action constituted a taking of "all economically viable use of [its] property" and seeking $6,000,000 in damages under the "taking" clauses of the United States and Utah Constitutions. See U.S. Const. amend. 5; Utah Const. art. I, § 22. The County moved for summary judgment in August 2002, arguing that "Diamond refused to further participate in the process ... forcing the County to deny that application for failure to satisfy the requirements of County ordinances"; "[t]he County's land use decision was not arbitrary, capricious or illegal"; and "[t]he County's denial of the conditional use permit did not effect a compensable taking under the Utah or United States Constitutions." Diamond opposed the motion, but did "not challenge the wisdom of the County's decision." Instead, Diamond argued that "the EIS was irrelevant and the permit was denied because the County decided it would not allow a gravel pit at this location," and, aside from operating a gravel pit, "[t]here are no other economically viable uses for the land."

¶ 11. In support of the latter proposition, Diamond offered an affidavit of a real estate expert asserting his "opinion that the property as zoned could not be economically operated for forestry, grazing, agricultural or recreational purposes ... [and] that the only economical[ly] viable use of [Diamond's] property would be for the extraction of sand and gravel." Nonetheless, the trial court granted the County's motion for summary judgment, determining that "Diamond has no protected property interest in a conditional use" and "the County's denial of Diamond's conditional use permit application did not

deprive Diamond of a protected property interest subject to compensation as a taking." The court concluded that "Diamond made no meaningful attempt to satisfy the require- ments for the granting of a conditional use permit and consequently received the inevit- able denial of the application." Diamond ap- peals.

## ISSUE AND STANDARD OF REVIEW

¶ 12 Diamond argues that the denial of a conditional use permit allowing it to conduct gravel extraction and related activities on its land constitutes a "regulatory taking" com- pensable under state and federal constitu- tional law because the only economically via- ble use for the property is extracting sand and gravel. The County's position is that no regulatory taking could have occurred be- cause Diamond did not have a protected property interest in a conditional use permit. The County argues in the alternative that even if such a property interest does exist, the issue is not ripe for determination be- cause the decision to deny the permit was based on Diamond's failure to adequately pursue the application rather than on the merits of the application.

¶ 13 Summary judgment is appropri- ate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). *See Guardian Title Co. of Utah v. Mitchell,* 2002 UT 63, ¶ 12, 54 P.3d 130. Summary judgment "should not be [granted] on conjecture, but only when the matter is clear; and in case of doubt, the doubt should be resolved in allowing the challenged party the opportunity of at least attempting to prove his right to recover." *Durham v. Margetts,* 571 P.2d 1332, 1334 (Utah 1977). For this reason, "[w]e review the facts and inferences in the light most favorable to" Diamond, *Callioux v. Progres- sive Ins. Co.,* 745 P.2d 838, 840 (Utah Ct.App.

1987), and "we accord no deference to the trial court and review its ruling for correct- ness." *Price Dev. Co. v. Orem City,* 2000 UT 26, ¶ 9, 995 P.2d 1237.

## TAKINGS LAW

¶ 14 The Takings Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *see Chicago, Burlington & Quincy R.R. Co. v. City of Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897), states that "private property [shall not] be taken for public use, without just compensation." [2] U.S. Const. amend. V. Although physical occupation is the clearest example of a taking that requires compensation, *see, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982), the United States Su- preme Court has recognized two other cate- gories of takings: regulatory takings and development exactions. [3] Regulatory takings are the type relevant to this appeal. As Justice Holmes stated in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a tak- ing." *Id.* at 415, 43 S.Ct. at 160. A regula- tion has gone too far when the "regulation denies all economically beneficial or produc- tive use of land," *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992), or, even if the property has not necessarily been deprived of *all* economically beneficial use, an analysis of several factors indicates that the interference is so great that a virtual taking has nonetheless occurred. *See Palaz- zolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001). "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with dis-

---

**2.** Diamond also brought its claim under the Utah Constitution, which provides that "[p]rivate property shall not be taken or damaged for pub- lic use without just compensation." Utah Const. art. I, § 22. In light of the similarity of the state and federal clauses and Diamond's reliance on federal case law, we primarily analyze this case using federal precedent.

**3.** For a summary of the jurisprudence concern- ing the three categories of takings, see *B.A.M. Development, L.L.C. v. Salt Lake County,* 2004 UT App 34, ¶¶ 36–44, 493 Utah Adv. Rep. 34, 87 P.3d 710 (Orme, J., dissenting).

tinct investment-backed expectations ... [and] the character of the governmental action" are factors considered in the latter kind of cases. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). An analysis of the impact and character of the government interference aids in accomplishing "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo,* 533 U.S. at 617–18, 121 S.Ct. at 2457–58 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).

## ANALYSIS

### I. The Property Interest at Issue

¶ 15 The County's primary response to Diamond's complaint that "[t]he actions of [the County] on September 18, 2001, damaged [Diamond]'s property, and took all economically viable use of [it]s property" is that Diamond has no protected property interest because the County has discretion to deny a conditional use permit based on the detrimental impacts of the proposed use. The Uniform Zoning Ordinance of Tooele County echoes Utah Code Annotated section 17–27–103, which defines "conditional use" as "a land use that, because of its unique characteristics or potential impact on the county, surrounding neighbors, or adjacent land uses, may not be compatible in some areas or may be compatible only if certain conditions are required that mitigate or eliminate the detrimental impacts." Utah Code Ann. § 17–27–103(1)(c) (2001). At the time of Diamond's purchase, the property was zoned such that mining and related activities, including gravel extraction, were designated as conditional uses. Thus, the County's argument is essentially that because "an owner of property holds it subject to zoning ordinances enacted pursuant to a state's police power," *Western Land Equities, Inc. v. City*

*of Logan,* 617 P.2d 388, 390 (Utah 1980), and the ordinance affecting the property at issue designated extraction activities as a conditional use, the bundle of rights acquired by Diamond when it obtained title to the property included the right to *apply* for a conditional use permit, not the right to *acquire* the permit. However, this argument presumes that there are other rights in the bundle that would permit some other beneficial use of the property.

¶ 16 Given the conditional nature of the permit, the County argues, and the trial court agreed, that Diamond cannot state a claim under the Takings Clause because Diamond does not possess a constitutionally protected property right to issuance of such a permit. The Utah Supreme Court has held that "[i]n order to have a valid property interest in a state-created right, a plaintiff 'must have more than a unilateral expectation of it;' instead, the plaintiff must have a 'legitimate claim of entitlement to it.' " *Patterson v. American Fork City,* 2003 UT 7, ¶ 23, 67 P.3d 466 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). The County seizes on Diamond's assertion that it "acquired its real property in Tooele County with the singular expectation of mining sand and gravel," and argues that Diamond's expectation of obtaining a conditional use permit does not equate to a legitimate claim of entitlement. The County is correct that there must first be a lawful property interest to assert a claim, but the County and the trial court have incorrectly characterized Diamond's relevant property interest.

¶ 17 The interest Diamond asserts is not limited to the right to secure a permit that would enable Diamond to excavate sand and gravel. In fact, Diamond "does not question the validity or wisdom of [the] County's denial of [Diamond]'s gravel pit permit application." Instead, Diamond asserts that the effect of the County's action leaves Diamond with over 190 acres of worthless land.[4]

---

4. Although it admittedly strains logic to suggest that extracting gravel is truly the only beneficial use for such a large piece of land—which is partially within the town limits of Stockton, close to the ever-burgeoning Wasatch Front, and

zoned for several permitted uses including single family dwellings, duplexes, and wind and solar power generation—skepticism based on life experience is no basis for sustaining the grant of summary judgment. By Diamond's counsel's

¶ 18 The trial court incorrectly viewed this case as "an action to review [the County]'s denial of a conditional use permit for a sand and gravel extraction operation" rather than as a takings case. Diamond's constitutionally protected property interest is actually broader than a conditional use permit—it is the beneficial use of its property in general. Even though Diamond may not have a property interest in the permit itself—which the County argues obviates the need to pay just compensation under the Takings Clause—if the effect of denying the permit is "to leave [its] property economically idle, [Diamond] has suffered a taking." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992) (footnote omitted). Thus, because the ultimate effect of denying the permit is factually in dispute, the trial court erred in granting summary judgment. If "the inquiry asks if a regulation has 'gone too far,' ... no answer is possible until [the] court knows what use, if any, may be made of the affected property." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350, 106 S.Ct. 2561, 2567, 91 L.Ed.2d 285 (1986).[5]

## II. The Basis for the County's Determination

¶ 19 The County's related argument is that a regulatory taking could not have occurred because the permit was not denied by the County on the merits of Diamond's application, but was instead denied on procedural grounds. This raises a question of ripeness. The argument is essentially that Diamond failed to present enough evidence to allow the County to conclude that a gravel operation would be compatible with the surrounding area, and thus, the decision to deny the permit was not made on the merits of the application. "[A] takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' " *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 2458, 150 L.Ed.2d 592 (2001) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985)).

¶ 20 Section 7–3 of the Tooele County ordinance explains that "[t]he listing of a conditional use ... does not constitute an assurance or presumption that such conditional use will be approved. Rather, each proposed conditional use shall be evaluated on an individual basis." Section 7–5(2) of the Tooele County ordinance further states that "[a] conditional use permit shall not be authorized unless sufficient evidence is presented to establish that ... such use will not, under the circumstances of the particular case, be detrimental to the health, safety, comfort, order or general welfare of persons residing or working in the vicinity." Clearly, the burden of persuasion is on the party seeking the permit to put forth sufficient evidence to allow the County to consider the merits of the application, but it is unclear to what lengths that party must go in seeking approval of the permit. Of course, futile efforts are not required.

¶ 21 The County claims that "Diamond simply made no effort to establish a record upon which the County could have approved the permit consistent with the requirements of the applicable ordinances ... and forc[ed] a decision without making any evidentiary showing." The County also accuses Diamond of "effectively abandon[ing] its conditional use application without ever making any real attempt to provide the County with sufficient information regarding the potential adverse impacts of a gravel operation at that specific site." Although the County argues that Diamond "abandoned" its application, the County does not convincingly outline what additional efforts Diamond could have made that would have allowed it to obtain the

own admission, Diamond bears an onerous burden in showing that there is no other use for the property. This opinion should not be taken as an indication that Diamond will be victorious—only that it is entitled to fight its uphill battle.

5. "A property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350 n. 7, 106 S.Ct. 2561, 2567 n. 7, 91 L.Ed.2d 285 (1986).

permit.[6] Likewise, the trial court determined that "Diamond simply failed to provide the County with evidence to satisfy its burden ... [and] failed to provide an EIS[7]. . . . In summary, Diamond made no meaningful attempt to satisfy the requirements for the granting of a conditional use permit and consequently received the inevitable denial of the application."

¶ 22 The minutes of the County Commission's meeting are instructive as to the actual reasons for the County's denial of the permit. Incompleteness of the application or other procedural deficiencies are simply not mentioned. Relevant comments of the two commissioners voting to deny the permit were recorded as follows:

Commissioner White stated his reasoning for being opposed to this is that he feels the health and safety of the citizens of Stockton can be in danger if that type of thing is put within that short of distance of the housing. "We're talking between 1/4 of a mile and 1/2 mile, somewhere in that range. I think it would definitely reduce the quality of life of the people who live there as well. I think the health and safety has a compelling interest over the land owner's use." He believes there are other uses of the land that can exist, so therefore, the county may be viewed upon as reducing what the value of the land might be otherwise, but based upon the fact that a portion of the property was sold to [a] church, in this case there is potential for the property to be used for other than what the owner wishes to use it for. The county also has on file another property owner adjacent to that property that has submitted a conditional use permit application for another request and this property could be used for what that person is using it for, windmills for power generation. Commissioner White didn't view the denial of the [conditional use permit] as a taking. It may be reducing the value possibly, but he didn't look at it as a taking.

Commissioner Rockwell stated he would echo the same thing. Because of the proximity to the Town of Stockton and its citizens, this property is not the place to put the gravel pit and related operations. He believes there are other uses for this [type] of property. They might not be as easy as trying to get into a gravel pit, but for the safety and health of those citizens in that area he would vote to deny the [conditional use permit].

¶ 23 The basis for the County Commission's denial of the permit is contained in the above excerpt.[8] Conspicuously absent from the comments of the commissioners is any

---

**6.** The County argues on appeal that the Commission recommended that Diamond provide an EIS and Diamond did not do so. The County also suggests that "[t]he EIS ... was proposed simply as a means of identifying whether there would be site-specific adverse impacts from the conditional use and what those impacts may be." The County does not explicitly argue that Diamond's failure to provide an EIS was a basis for the County's denial of the permit; and in denying the application, the County Commission did not cite the lack of an EIS as a basis for the denial. Given the procedural posture of this case, we will draw all reasonable inferences in favor of Diamond, *see Callioux v. Progressive Ins. Co.,* 745 P.2d 838, 840 (Utah Ct.App.1987), and accordingly must presume that the lack of an EIS did not render the application incomplete. If the County Commission had concluded otherwise, it would have been easy enough for it to have said so.

**7.** The County concedes that producing an EIS was simply one way for Diamond to meet the concerns of the County Commission, but asserts Diamond "failed to offer any other information in lieu of the EIS to address the potential impacts of its conditional use and to help the County formulate conditions to mitigate those impacts."

**8.** The accuracy of the County Commission's suggestion that there are other possible uses for the property will have to be determined in the trial court in the event that Diamond chooses to pursue its claim. In ruling on the motion for summary judgment in this matter, the trial court stated that "even though it is unnecessary to the opinion, ... this Court sees no deprivation of reasonable or economically beneficial use [and i]t is axiomatic that Diamond cannot argue that the denial of a *conditional use* of the Property somehow deprives it of all reasonable or economically beneficial use." (emphasis in original). Although we share the skepticism of the commissioners and the trial court, *see* supra note 4, Diamond has alleged that the property was not suitable for other economically viable uses, and backed that contention up with an expert's affidavit, and it was therefore inappropriate for the court to abort Diamond's chance for relief at this early stage of the proceedings.

reference to the lack of an EIS or, for that matter, any procedural failure on the part of Diamond in completing the application process.

¶ 24 Diamond's persuasive response to this argument is twofold. First, the County-approved engineering firms that submitted bids to conduct the EIS offered to perform only part of the work that had been requested, with a price tag of over $100,000. Although Diamond sought bids from seven firms, none of them were able to provide the EIS the Planning Commission had requested. Second, the primary objection to operating a gravel pit on the property has consistently been the property's proximity to the town, and the resultant health, safety, and welfare concerns. This pivotal proximity concern was not something that the preparation of an EIS could change.

¶ 25 Although the Planning Commission had earlier requested an EIS, neither the Planning Commission nor the County Commission based their recommendation or decision on the lack thereof. Over a year elapsed between the time that the application was submitted and the time that it was denied. During this time, Diamond sought both to have its property rezoned and to get a permit allowing gravel extraction on the property under the previous zoning ordinance. Diamond also sought to obtain the EIS, but understandably determined that it would be futile to spend over $100,000 "in light of the limitations of the work to be achieved, and the strong public opposition." Diamond finally offered to accept a permit drawn in accordance with other permits the County had recently issued authorizing gravel operations. Since the parties agree that Diamond submitted the two-page application required of it, and the County Commission did not cite noncompliance with application procedures in denying the permit, Diamond's takings claim is clearly ripe for determination. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626, 121 S.Ct. 2448, 2462, 150 L.Ed.2d 592 (2001).

## CONCLUSION

¶ 26 We reverse the summary judgment against Diamond and remand for trial or such other proceedings as may now be appropriate.

¶ 27 I CONCUR: NORMAN H. JACKSON, Judge.

¶ 28 I CONCUR IN THE RESULT: WILLIAM A. THORNE JR., Judge.