2005 UT App 165

**Jason P. ARNELL, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY BOARD OF ADJUSTMENT, Salt Lake County, and Truman G. Madsen, Defendants and Appellees.**

No. 20040409–CA.

Court of Appeals of Utah.

April 7, 2005.

David E. West, Salt Lake City, for Appellant.

Donald H. Hansen, Salt Lake City, and Barnard N. Madsen, Provo, for Appellees.

Before BILLINGS, Presiding Judge, GREENWOOD, and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

¶ 1 Plaintiff Jason P. Arnell asserts that he is entitled to just compensation from Defendants Salt Lake County Board of Adjustment (the Board) and Salt Lake County (the County)[1] (collectively referred to as the County) under federal takings jurisprudence. Alternatively, Plaintiff argues that he is entitled to rescind his land purchase contract with Defendant Truman G. Madsen (Madsen). The trial court granted summary judgment in favor of all Defendants and denied Plaintiff's motion for summary judgment against Defendants. We reverse and remand the trial court's decision as to the County, and affirm the trial court's decision in favor of Madsen and against Plaintiff.

## BACKGROUND

¶ 2 On May 4, 1999, Plaintiff, a general contractor, purchased an undeveloped real estate lot (Lot 13) in the Forest Hills Subdivision near Brighton, Utah, from Madsen for $95,000, for the purpose of constructing a canyon residence. Madsen conveyed Lot 13 to Plaintiff by warranty deed. Based on his experience, and because there were residences on surrounding lots, Plaintiff believed he could build a residence on Lot 13. Madsen, for his part, also believed that structures

---

1. Although the Board and the County are listed as separate parties to the appeal, because Plaintiff does not aver any separate claims on appeal against the Board, and because both parties have the same interest and have acted as a single entity throughout the proceedings, we treat both as "the County" in this opinion.

could be built on Lot 13 because it was taxed at a continually increasing assessed value, and the tax notices identified the property as "secondary residence or commercial land." However, before the transaction, neither party investigated whether any building restrictions affecting Lot 13 existed.

¶ 3 Upon filing for a building permit, Plaintiff discovered that, in August 1997, the County enacted an ordinance (Slope Ordinance) that prohibits development of property located on slopes greater than 30% within the "Foothills and Canyons Overlay Zone" (FCOZ).[2] Forest Glen Subdivision, including Lot 13, is located within the FCOZ. Lot 13 contains an average slope grade that exceeds 40%, with some portions above 50%.

¶ 4 At the time of purchase, neither Plaintiff nor Madsen knew about the Slope Ordinance.[3] After learning of the Slope Ordinance, Plaintiff applied for and was denied a variance by the Board. The Board determined that Lot 13 exceeded the slope requirement, and that Plaintiff had not provided sufficient information to qualify for a variance.

¶ 5 Plaintiff then filed a takings relief petition (the Petition) with the Salt Lake County Commission (the Commission) under Salt Lake County Ordinance 19.93.030 (Takings Ordinance), enacted pursuant to Utah Code section 17–27–102. See Utah Code Ann. § 17–27–102 (2001). The Takings Ordinance provides a procedure for obtaining relief where a taking of property has occurred. Pursuant to the Takings Ordinance, the Commission made a preliminary determination that a taking may have occurred. The Commission appointed a hearing officer to conduct a hearing to determine whether a

taking had occurred and to make recommendations to the County.

¶ 6 The hearing officer considered evidence from both Plaintiff and the County. Plaintiff's evidence consisted of his own opinion that the market value of Lot 13 unaffected by the Slope Ordinance was $95,000, that it was worthless with the application of the Slope Ordinance, and that building a residence was the only viable use for Lot 13. Plaintiff also provided conclusory expert testimony from his architect and a soil engineer that construction on Lot 13 was feasible. The County cursorily disputed Plaintiff's valuation evidence. However, the crux of the County's argument before the hearing officer—and later before the Commission, the trial court, and now on appeal—was that the County never disputed the feasibility of building on Lot 13 per se, only that it wanted Plaintiff to provide site-specific geotechnical and engineering studies proving the feasibility, rather than mere conclusory expert opinions.

¶ 7 Notwithstanding that all findings by the hearing officer were in Plaintiff's favor, the hearing officer recommended that the Petition be denied because Plaintiff had no standing since he acquired Lot 13 after the Slope Ordinance was enacted.[4]

¶ 8 The County delayed action on the recommendation, in part to provide Plaintiff with further opportunity to provide site-specific data proving the feasibility of building a residence. Plaintiff did not provide the requested studies, arguing that they were too costly, especially because the studies would not assure County approval or his ability to build.

2. The County, through various zoning ordinances, has actually restricted canyon residential development on slopes greater than 30% since 1973.

3. However, Madsen did parlay the sale of Lot 13 into the purchase of another lot (Lot 3) in the Forest Glen Subdivision. During the instant action, Madsen learned that Lot 3 violated the Slope Ordinance. Madsen promptly requested that the County either allow a structure on Lot 3, or reduce its assessed value. In response, the County reduced the assessed value from $71,800 to $9,800, and refunded part of the 2002 taxes Madsen paid on Lot 3.

4. The hearing officer found that both Plaintiff and the County offered only conclusory opinions regarding the feasibility of building on Lot 13. However, the County failed to counter Plaintiff's assertions, and thus building on Lot 13 was deemed feasible because "the even quality of the evidence on both sides negates the impact of the lack of actual ... tests on the subject property by Plaintiff." Also, although the hearing officer found that there were no other economically viable uses for Lot 13, in a footnote he opined that Lot 13 has value greater than $0, but the actual value was impossible to determine without actual offers from buyers.

¶9 On June 28, 2001, subsequent to the hearing officer's recommendation, the United States Supreme Court decided *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). *Palazzolo* held, in part, that a takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Id.* at 630, 121 S.Ct. 2448. In so holding, the Court noted:

> Were we to accept [a contrary] rule, the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.

*Id.* at 627, 121 S.Ct. 2448. Accordingly, Plaintiff did not lack standing merely because he acquired title to Lot 13 after enactment of the Slope Ordinance. Consequently, the hearing officer provided a copy of this case to both the County and Plaintiff, noting that "it is clear that the *Palazzolo* case overrules my recommended decision."

¶10 Plaintiff appealed to the Salt Lake County Council (the Council).[5] The Council received no evidence, but heard legal arguments regarding the effect of *Palazzolo,* and voted 5–3 to deny Plaintiff's Petition for compensation or a building permit. The Council's Findings of Fact and Conclusions of Law list a variety of reasons for the denial, including: general problems with building on steep mountainous terrain; that Plaintiff did not show a right of access to downhill sewer lines or water; that the Slope Ordinance is necessary to protect the health, safety, and welfare of the Plaintiff and the general public; and that the effect of "granting an exception to, or compensating, [Plaintiff] might be that the County is obligated to grant similar relief to other lot owners similarly situated ...

effectively rescinding residential building restrictions." [6]

¶11 Plaintiff subsequently filed a complaint in district court alleging, among other claims not relevant to this appeal, that the County's actions constituted a taking of all "economically viable use of his property" and seeking damages for the reasonable value of his property—$95,000—under the Takings Clauses of the United States and Utah Constitutions. *See* U.S. Const. amend. V; Utah Const. art. I, § 22. Plaintiff also sought rescission of the purchase contract for Lot 13 with Madsen on the grounds of mutual mistake, breach of warranty deed, and breach of the implied warranty of fitness.

¶12 All parties moved for summary judgment on all claims. The trial court granted the County's and Madsen's motions for summary judgment against Plaintiff, and denied Plaintiff's motion for summary judgment. Regarding the County, the trial court determined that Plaintiff had standing, but that Plaintiff's takings claim "is not necessarily ripe," and, in any case, because "[P]laintiff cannot demonstrate that the ordinance in question is depriving him of any economically viable use for his property, there has been no takings under *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)." With regard to Madsen, the trial court determined that there was no breach of warranty deed "because the warranty deed at issue failed to contain a covenant warranty against government building restrictions. Furthermore, a government building restriction is not an 'encumbrance' "; that "Utah does not recognize a claim for breach of implied warranty of habitability"; and that the doctrine of mutual mistake of fact requires a mistake as to an existing fact and "[t]he County's refusal to grant a variance was a future act not an existing fact."

## ISSUES AND STANDARD OF REVIEW

¶13 Plaintiff argues that he is entitled to just compensation under the Fifth

5. During the interim, the County converted from a Commission form of government to a Council–Mayor form. *See* Salt Lake County Ordinances §§ 1.01.030, et seq.

6. Noticeably absent from the "Conclusions of Law" is any reference to Plaintiff's failure to provide site-specific data on the feasibility of building on Lot 13. The sole reference is found in the "Findings of Fact" where it is not cited as a reason for the denial, but simply as a fact.

Amendment to the U.S. Constitution [7] for a regulatory taking because (1) his claim is ripe for adjudication, and (2) the regulation has deprived him of all economically viable use of his property. The County responds that Plaintiff is not entitled to just compensation because a variance from the Slope Ordinance was possible, but Plaintiff failed to allow the County to exercise its discretion by failing to provide the requested site-specific engineering and geotechnical data proving that building on Lot 13 was feasible.[8]

¶ 14 Plaintiff argues against Madsen that he is entitled to rescind the purchase contract for Lot 13 on the grounds of (1) mutual mistake of fact, (2) breach of the covenant against encumbrances, and (3) breach of the implied warranty of fitness.

¶ 15 "Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' " *Diamond B–Y Ranches v. Tooele County*, 2004 UT App 135,¶ 13, 91 P.3d 841 (omission in original) (quoting Utah R. Civ. P. 56(c)), *cert. denied*, 98 P.3d 1177 (Utah 2004). "When reviewing a grant of summary judgment, we view all facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and review the trial court's conclusions of law for correctness." *Khalsa v. Ward*, 2004 UT App 393,¶ 5, 101 P.3d 843.

## ANALYSIS

### I. Takings Claim

#### A. Overview of Takings Law

¶ 16 The Takings Clause of the Fifth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, *see Chicago, Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 241, 17 S.Ct. 581, 41 L.Ed. 979 (1897), states that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). "[T]he United States Supreme Court has recognized two other categories of takings: regulatory takings and development exactions." *Diamond B–Y Ranches*, 2004 UT App 135 at ¶ 14, 91 P.3d 841. This case involves a regulatory taking.

¶ 17 The United States Supreme Court first recognized regulatory takings in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). In Justice Holmes's now famous words, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. 158. A regulation that " 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo*, 533 U.S. at 617, 121 S.Ct. 2448 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). This is a so-called total taking. Even if a regulation falls short of eliminating all economically beneficial use of land, an analysis of a complex of factors indicates whether the interference is so great that a virtual taking has nonetheless occurred. *See id.* The factors include "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations

---

7. Plaintiff cursorily raises the takings issue under the Utah State Constitution, but "does not separately treat or brief the taking issue under the Utah Constitution." *Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 250 n. 4 (Utah Ct.App.1998) (additional quotations and citation omitted). " 'We [thus] do not undertake an independent state analysis.' " *Id.* (alteration in original) (citation omitted).

8. Plaintiff also argues, apparently as a part of his takings challenge, that the Slope Ordinance amends a platted subdivision, in violation of Utah Code section 17–27–810(1)(b), because no specific finding was made that no "person will be materially injured by ... the amendment." Utah Code Ann. § 17–27–810(1)(b) (1999). However, we find that section 17–27–810 is not offended because zoning ordinances, which are similar to the Slope Ordinance, do not actually "amend" subdivision plats, they operate independently of them.

... [and] the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). "These inquires are informed by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Palazzolo*, 533 U.S. at 617–618, 121 S.Ct. 2448 (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

■ ¶ 18 Plaintiff seeks compensation under these principles. At the outset, however, it must be determined whether Plaintiff's claim is ripe for judicial review.[9]

### B. Ripeness

■ ¶ 19 The central issue in this appeal is whether Plaintiff's takings claim is ripe for judicial review.[10] The ripeness rules for takings claims are well established. In *Palazzolo*, the Court stated:

> Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established. Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision.

*Id.* at 620–21, 121 S.Ct. 2448 (citation omitted).

¶ 20 In accordance with this rule, the County argues that the extent of development permitted on Lot 13 is not yet known because a variance from the Slope Ordinance may have been possible if Plaintiff had only provided the County with the requested site-specific geotechnical and engineering data, thus persuading the County that building on Lot 13 was feasible. Likewise, the trial court found that although the Council's Findings of Fact and Conclusions of Law

> provide[ ] at least colloquial support for a contention that the decision precludes any building on the lot ... the failure to provide a report of the actual soils on the site in a form that was sufficient for the County to act knowledgeably on the request makes it impossible for the County to determine whether the requirements for granting a variance have been met. The case, therefore, is not necessarily ripe.

¶ 21 Plaintiff counters that his takings claim is ripe because providing more detailed studies would have been futile as the County has made it clear, as illustrated by the Council's findings, that no variances from the Slope Ordinance, and no building upon Lot 13, would be allowed under any circumstances. In support of this proposition, Plaintiff cites *Diamond B–Y Ranches v. Tooele County*, 2004 UT App 135, 91 P.3d 841, *cert. denied*, 98 P.3d 1177 (Utah 2004).

¶ 22 In *Diamond*, Diamond B–Y Ranches (Diamond) was unable to sell 190 acres of mining land when Tooele County (Tooele) refused to grant a conditional use permit for gravel mining because of potentially adverse environmental and health consequences. *See id.* at ¶¶ 3–5. However, Tooele agreed to "table" the permit while Diamond obtained an Environmental Impact Statement (EIS)

---

9. We note briefly that Plaintiff makes an "as applied" challenge to the Slope Ordinance, rather than a "facial" challenge, because the Slope Ordinance allows for variances and is being challenged only as it applies to Lot 13. As an "as applied" challenger, Plaintiff is required to exhaust administrative remedies, but may recover under either a total or virtual taking theory. *See Smith Inv. Co. v. Sandy City*, 958 P.2d 245, 251 n. 5, 257–258 n. 19 (Utah Ct.App.1998).

10. Curiously, the County argues in its brief that "there is no issue of ripeness or finality here." However, it seems that the substance, if not the name, of the County's argument is that Plaintiff's variance application was incomplete, and was thus denied on procedural grounds rather than on its merits. This is a ripeness argument. *See Diamond·B–Y Ranches v. Tooele County*, 2004 UT App 135, ¶ 19, 91 P.3d 841, *cert. denied*, 98 P.3d 1177 (Utah 2004).

for the proposed operation. *See id.* at ¶ 4: Diamond did not obtain an EIS because, at $100,000, it was cost prohibitive, but did offer to abide by all requirements imposed on other similar mining operations. *See id.* at ¶ 8. Nevertheless, Tooele denied the permit. *See id.* at ¶ 9.

¶ 23 Diamond filed suit in district court alleging that Tooele's actions constituted a taking of all economically viable use of its property. *See id.* at ¶ 10. The trial court granted summary judgment for Tooele, deciding that Diamond had no protected property interest in a conditional use permit and that the case was not ripe because Diamond made no meaningful attempt to satisfy the requirements for obtaining a conditional use permit. *See id.* at ¶ 11.

¶ 24 On appeal, we reversed and remanded for a determination of whether a total taking occurred. *See id.* at ¶¶ 25–26. We determined that a material issue of fact existed whether the denial of the conditional use permit adversely affected Diamond's protected property interest in its land. *See id.* at ¶ 18. Addressing the ripeness argument, we noted that while the burden was on the applicant to submit sufficient information to allow Tooele to consider the merits of the application, futile efforts were not required. *See id.* at ¶ 20. We further held that Diamond's takings claim was ripe because Tooele did not cite the failure to obtain an EIS or other procedural deficiencies as reasons for denying the permit. *See id.* at ¶¶ 22–23, 25. Rather, the minutes of the County Commission revealed that the permit was actually denied because of "the property's proximity to the town, and the resultant health, safety, and welfare concerns." *Id.* at ¶ 24. These were concerns "that the preparation of an EIS could [not] change." *Id.*

¶ 25 The similarity between *Diamond* and the case at bar is noteworthy. Plaintiff sought and was denied both a building permit and a variance from the Slope Ordinance. He then filed the Petition for just compensation with the County. The hearing officer found in favor of Plaintiff on all factors,

including the feasibility of building on Lot 13, but denied Plaintiff's Petition only because Plaintiff lacked standing. The County "tabled" the Petition to allow Plaintiff to provide more detailed site-specific studies, which Plaintiff did not provide because they were cost prohibitive. Plaintiff then appealed to the Council, which also denied the Petition, even though the *Palazzolo* decision, decided in the interim, made the standing issue moot. *See Palazzolo v. Rhode Island,* 533 U.S. 606, 630, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

¶ 26 The County maintains that it denied the Petition because Plaintiff failed to provide the requested site-specific data to obtain a variance. However, the Council's Findings of Fact and Conclusions of Law belie this argument. As reasons for denying the variance, the Council's Conclusions of Law describe a lack of sewer and fresh water access; "protection of health, safety, and welfare of the property owner, adjoining property owners, and the general public"; and dangers with construction on steep slopes in general. Conspicuously absent from the Council's Conclusions of Law is any mention of a lack of site-specific studies submitted by Plaintiff. The lone reference to this alleged procedural failure by Plaintiff is in the Findings of Fact, but was not cited as a basis for the denial.[11] Indeed, the Council's final conclusion is perhaps the most telling as to the County's actual reason for denying Plaintiff a variance:

> The effect of granting an exception to, or compensating, [Plaintiff] might be that the County is obligated to grant similar relief to other lot owners similarly situated in existing and future subdivisions, effectively rescinding residential building restrictions on slopes that have been accepted by property owners and developers and enforced for well over 25 years. Granting an exception would defeat the purpose of the Wasatch Canyon Master Plan and FCOZ and would result in a manifest injustice to those who have complied in the past and will do so in the future.

¶ 27 Based on the above findings, and in accordance with *Diamond,* it is clear

---

11. This finding states, "the [Commissioners] continued for six months a final decision of [Plaintiff's] Takings Relief Petition ... to allow time for the parties to 'conduct further investigation'.... [Plaintiff] provided general information but unsatisfactory *site-specific* geotechnical data."

that Plaintiff would not have been granted a variance from the Slope Ordinance to build on Lot 13 under any circumstances.[12] Therefore, Plaintiff's takings claim is ripe because the extent that the Slope Ordinance restricts development on Lot 13 is certain: it is a complete bar.[13]

## C. Plaintiff's Takings Claim

¶ 28 Since we find that Plaintiff's takings claim is ripe, and because Plaintiff also appeals from the trial court's denial of his motion for summary judgment, we must decide whether Plaintiff has carried his burden of showing that he has suffered a compensable taking of his property and that no genuine issues of material fact exist.

¶ 29 There are two aspects to this issue: (1) is Plaintiff entitled to compensation under the Takings Clause jurisprudence, and (2) if so, has Plaintiff established the economic impact of the enforcement of the Slope Ordinance?

¶ 30 First, we consider the status of Plaintiff's claim that he suffered a taking under the Takings Clause of the United States Constitution. The trial court, in granting the County's motion for summary judgment on ripeness grounds, considered "for argument's sake, that [P]laintiff's claim was ripe," and undertook a limited takings analysis under

---

**12.** We have no quarrel with the County's legitimate exercise of its authority to enforce ordinances deemed to be in the public interest. It follows, however, that in some instances the County must compensate those whose property is "taken" so as to invoke constitutional protection. *See, e.g., Palazzolo v. Rhode Island,* 533 U.S. 606, 627, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) ("The Takings Clause ... in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation.").

**13.** A final ripeness issue remains. In granting summary judgment for the County, the trial court determined that the lack of sewer and water access may have prevented Plaintiff from building on Lot 13 even if he had been granted a variance from the Slope Ordinance, and thus Plaintiff suffered no taking. We disagree. In *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), the State asserted that the claimant's takings claim was not ripe because the claimant did not first obtain zoning approval or a permit for sewage disposal

*Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), by considering "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations ... [and] the character of the governmental action." *Id.* at 124, 98 S.Ct. 2646. The trial court noted that if Plaintiff is prohibited from developing Lot 13, it is undisputed that the economic impact of the Slope Ordinance and its interference with Plaintiff's investment-backed expectations would be significant. Nevertheless, the trial court concluded that no compensable taking occurred because the character of the governmental action was not a physical invasion of Plaintiff's property but a conditional prohibition, enacted for safety and aesthetic reasons, affecting only the owners of property exceeding a certain slope gradient.

¶ 31 A "landowner whose deprivation is one step short of complete" may be entitled to compensation under the principles announced in *Penn Central.* *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The claimants in *Penn Central* were owners of Grand Central Terminal (the Terminal), who sought to construct a 53-story

systems for his proposed use. *See id.* at 624, 121 S.Ct. 2448. The Court rejected this argument because the other applications would have been futile, *see id.* at 626, 121 S.Ct. 2448, "for the limitations the wetland regulations imposed were clear from the ... denial of his applications, and there is no indication that any use involving any substantial structures or improvements would have been allowed." *Id.* at 625, 121 S.Ct. 2448. Similarly, in the instant case, requiring Plaintiff to apply for sewer and water access in order to ripen his claim would be futile because it is clear from the Council's decision that the Slope Ordinance forbids building on Lot 13.

However, "[w]hen a taking has occurred, under accepted condemnation principles the owner's damages will be based upon the property's fair market value, an inquiry which will turn, in part, on restrictions on use imposed by legitimate zoning or other regulatory limitations." *Id.* at 625, 121 S.Ct. 2448 (citations omitted). Thus, while Plaintiff's ability to acquire water and sewer access for Lot 13 is not relevant to a ripeness inquiry, it may be relevant in calculating his damages.

office building on top of the Terminal. *See Penn Central*, 438 U.S. at 115–17, 98 S.Ct. 2646. However, a historical landmarks statute, which applied to the Terminal, prevented the desired development. *See id.* at 118, 98 S.Ct. 2646. The Court granted certiorari to determine, among other things, whether the landmarks law, by prohibiting the claimants' desired use of the air space above the Terminal, sufficiently interfered with the claimants' property "that there must be an exercise of eminent domain and compensation to sustain [it]." *Id.* at 136, 98 S.Ct. 2646 (alteration in original) (quotations and citations omitted).

¶ 32 First, the Court noted that

we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances [in that] case.

In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by the government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* at 124, 98 S.Ct. 2646 (alteration in original) (quotations and citations omitted).

¶ 33 Before applying these factors, however, the Court reviewed its regulatory takings jurisprudence and observed that

in instances in which a state tribunal reasonably concluded that "the health, safety, morals, or general welfare" would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. Zoning laws are, of course, the classic example, *see Euclid v. Ambler Re-*

*alty Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303] (1926) (prohibition of industrial use); *Gorieb v. Fox*, 274 U.S. 603, 608 [47 S.Ct. 675, 71 L.Ed. 1228] (1927) (requirement that portions of parcels be left unbuilt); *Welch v. Swasey*, 214 U.S. 91 [29 S.Ct. 567, 53 L.Ed. 923] (1909) (height restriction), which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property.

*Id.* at 125, 98 S.Ct. 2646 (additional citations omitted).

¶ 34 However, even "a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount to a 'taking.'" *Id.* at 127, 98 S.Ct. 2646. The Court identified *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) as the leading case for this proposition. In *Mahon*, the claimant sold surface rights to its property, but reserved the right to mine coal thereunder. *See id.* at 412, 43 S.Ct. 158. A statute, enacted after the transactions, made it commercially impracticable to mine the coal. *See id.* at 412–13, 43 S.Ct. 158. Because the statute effectively destroyed the claimant's sole property interest, the statute was held invalid as effecting a taking without just compensation. *See id.* at 414–15, 43 S.Ct. 158.

¶ 35 Tempered by this jurisprudence, the *Penn Central* Court analyzed "the character of the action and ... the nature and extent of the interference with rights in the parcel as a whole," to determine whether a taking occurred. 438 U.S. at 130–31, 98 S.Ct. 2646. First, the Court determined that like zoning laws, the landmarks law was designed to promote the general welfare and the mere fact that it affected the claimants more than other property owners does not mean that the law effects a taking. *See id.* at 133–34, 98 S.Ct. 2646. In addition, the landmarks law did not interfere in any way with the present uses of the Terminal, "[s]o the law does not interfere with what must be regarded as [the claimants'] primary expectation concerning the use of the parcel." *Id.* at 136, 98 S.Ct. 2646. In fact, the landmarks law permitted the claimants to earn a profit and

a reasonable return on their investment. *See id.* Finally, because the landmarks law allowed, to a certain extent, for transference of the air rights· above the Terminal, the economic impact· of the regulation upon the claimants was mitigated. *See id.* at 137, 98 S.Ct. 2646. Based on these factors, the Court concluded that the landmarks law did not effect a taking. *See id.* at 138, 98 S.Ct. 2646.

■■■ ¶ 36 Applying these principles to the case at bar, we believe that the trial court's decision to grant the County's motion for summary judgment, to the extent (if any) it was based on *Penn Central,* was premature. Determinations of liability in regulatory takings cases, particularly under *Penn Central,* require ˙ "complex factual assessments of the purposes and economic effects of government actions," *Yee v. City of Escondido,* 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), making summary judgment generally inappropriate. In this case, because Plaintiff has offered only his own opinion regarding the value of Lot 13 considering the Slope Ordinance, additional factual determinations are necessary. The parties may also wish to present other evidence relating to factors important to determining whether a taking has occurred under the Takings Clause. Moreover, material issues of fact exist regarding the extent to which the Slope Ordinance has interfered with Plaintiff's reasonable investment-backed expectations.[14] A complete and developed factual record on this factor is crucial to a *Penn Central* analysis because "a state statute that substantially furthers important public policies may so frustrate distinct investment-backed expectations as to amount ·to a 'taking.' " 438 U.S. at 127, 98 S.Ct. 2646.

14. We note that the reasonableness of the investment-backed expectations in this case derives from the price paid for the property, the property tax imposed, and the existence of homes ·built adjacent to Lot 13 on the same slope gradient.

15. Although Plaintiff has thus far proceeded only under a total takings theory, as the trial court undertook a partial takings analysis during summary judgment, on remand Plaintiff will be able to pursue his claim under either a total or partial takings theory. *See Palazzolo v. Rhode Island,*

■■■ ¶ 37 Second, we consider whether Plaintiff has established the extent of his right to compensation, if any. A landowner may establish his right to compensation under either a total takings theory or a partial takings theory. *See Palazzolo v. Rhode Island,* 533 U.S. .606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Plaintiff has thus far pursued his claim only under a total takings theory, so our review of his motion for summary judgment is limited to determining whether he suffered a total taking.[15]

■■■ ¶ 38 To prevail under a total takings theory, Plaintiff must demonstrate that the Slope Ordinance "denies all economically beneficial or productive use" of Lot 13. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Plaintiff "bears an onerous burden in showing that there is no other use for [his] property." *Diamond B–Y Ranches v. Tooele County,* 2004 UT App 135,¶ 17 n. 4, 91 P.3d 841, *cert. denied,* 98 P.3d 1177 (Utah 2004); *see also Tahoe–Sierra Pres. Council v. Tahoe Reg'l. Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (noting that the categorical rule from *Lucas* "would not apply if the diminution of value were 95% instead of 100%"). However, "[a]ssuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest." *Palazzolo,* 533 U.S. at 631, 121 S.Ct. 2448. In support of his contention that the Slope Ordinance has deprived him of all economically viable use of his property, Plaintiff has thus far offered only his own opinion. .We find this insufficient, at this early stage, to prove that Plaintiff has suffered a total taking. Moreover, we find that a genuine issue of material fact exists as to how much value remains in Lot

533 U.S. 606, 630–31, 121 S.Ct. .2448, 150 L.Ed.2d 592 (2001) (remanding for consideration of the claimant's takings claim under the *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, ˙57· L.Ed.2d 631 (1978) analysis, even though the claimant˙proceeded only under a total takings theory below); *see also id.* at 650, 98 S.Ct. 2646 (Ginsberg, J., dissenting) (agreeing that the claimant "never raised or argued the *Penn Central* issue in the state system").

13 considering the Slope Ordinance and the County's denial of Plaintiff's application for a variance.[16]

¶ 39 Therefore, we remand for trial the issue of whether Plaintiff is entitled to just compensation under the federal Takings Clause, and if so, the amount of any such compensation, in light of our decision that Plaintiff's takings claim is ripe because the Slope Ordinance deprives Plaintiff of the ability to build a residence on Lot 13.

## II. Rescission

### A. Mutual Mistake

¶ 40 Plaintiff argues against Madsen that he is entitled to rescind the purchase contract for Lot 13 because there was a mutual mistake of fact in that the ability to build a residence on the lot was a basic assumption of the contract, and the Slope Ordinance, enacted prior to the sale, rendered Lot 13 unbuildable. Madsen's position, which carried the day in the trial court, is that rescission requires a mutual mistake as to an existing fact, and Plaintiff's failure to obtain a building permit or variance were future events. We agree with Madsen.

¶ 41 "It is well settled that a contract is voidable if there is a mutual mistake of material fact." *Mooney v. GR & Assocs.*, 746 P.2d 1174, 1178 (Utah Ct.App. 1987). "However, there can be no mutual mistake as to an event which is to occur in the future." *Id.* This rule is justified because " 'a contract often functions primarily to insulate the parties from uncertainty and to allocate the risk of future events.' " *Id.* (quoting *Beals v. Tri–B Assoc.*, 644 P.2d 78, 80 (Colo.Ct.App.1982)). Following these principles, in *Mooney* we held that there was no mutual mistake of fact because the failure to record a security interest was a fact that did not exist when "the parties entered into the agreement, and which could not have been known until sometime after the documents had been executed." *Id.*

¶ 42 The rationale of *Mooney* is applicable here. The contract between the parties was for the conveyance of Lot 13, an unimproved lot in the Forest Glen Subdivision. The event which caused the alleged material mistake of fact was Plaintiff's failure to obtain a permit to build on Lot 13, a fact which did not exist at the time the parties entered into the agreement. Indeed, it is undisputed that the contract was not contingent upon Plaintiff's ability to secure the necessary building permits. Any steps Plaintiff needed to take to improve the land were future events to which mutual mistake of fact is inapplicable. Moreover, although the Slope Ordinance effectively prevented Plaintiff from building on Lot 13 at the time of purchase, because a variance from the Slope Ordinance was theoretically possible, it was the County's refusal to grant a variance, some eight months later, that actually prevented Plaintiff from building his desired residence. Thus, although Plaintiff's inability to build a residence on Lot 13 "is a failure of expectation, it is not a mutual mistake of material fact." *Id.* Accordingly, we affirm this issue.[17]

---

16. We note that if Plaintiff establishes that a regulatory taking took place, the County retains options other than compensating Plaintiff, such as granting a variance or amending the ordinance. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (noting that "[o]nce a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain").

17. We distinguish several cases from other jurisdictions that Plaintiff cites in support of his argument that rescission is the appropriate remedy: *Rancourt v. Verba*, 165 Vt. 225, 678 A.2d 886, 887–89 (1996) (allowing rescission of a contract for the sale of lakeshore property on the grounds of mutual mistake when federal wetlands restrictions prohibited the plaintiff from obtaining a building permit. However, neither party appealed whether the trial court correctly concluded that a mistake of fact occurred, only whether rescission is a proper remedy for a mistake of fact.); *Louviere v. Meteye*, 260 So.2d 377, 378 (La.Ct.App.1972) (allowing rescission of a contract for the purchase of land for commercial purposes for mutual mistake when the buyer found that land was zoned residential. However, an express condition "that property be zoned 'C–2 Commercial' " was included in the contract.); *Millman v. Swan*, 141 Va. 312, 127 S.E. 166, 169 (1925) (allowing a buyer to rescind a contract for mutual mistake because both parties believed the subject lot was outside town fire limits, whereas it was inside. However, there is

## B. Breach of Warranty Deed

¶ 43 Plaintiff argues that he is entitled to rescind the purchase contract for Lot 13 because the Slope Ordinance is an encumbrance which violates the covenant against encumbrances in the warranty deed.

¶ 44 An encumbrance is "any interest in a third person consistent with a title in fee in the grantee, if such outstanding interest injuriously affects the value of property, or constitutes a burden or limitation upon the rights of the fee title holder." *Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 44, 48 P.3d 895 (quotations and citations omitted).

¶ 45 It is undisputed that title to Lot 13 passed from Madsen to Plaintiff by warranty deed and that the deed included a covenant against encumbrances. However, Madsen directs us to two analogous Utah Supreme Court cases that defeat Plaintiff's argument. In the first case, *Flemetis v. McArthur*, 119 Utah 268, 226 P.2d 124 (Utah 1951), the buyer of land argued that land use patents reserving water and mining rights in the government constituted a breach of the covenant against encumbrances. *See id.* at 125–126. The court rejected this argument, holding that "[p]urchasers of land must take notice of public statutes restricting the use of the granted premises and such restrictions constitute no breach of covenant or warranty." *Id.* at 126. The second case, *Mortenson v. Financial Growth, Inc.*, 23 Utah 2d 54, 456 P.2d 181 (Utah 1969), considered whether the reservation of mineral rights by state and federal statutes constituted an "encumbrance." *See id.* at 183. After citing *Flemetis* approvingly, the court held that "the liens or encumbrances assured against in the contract are the usual type of liens or encumbrances arising from the acts of private individuals and not those created by public law." *Id.*

¶ 46 These cases are dispositive on the present issue. Plaintiff is charged with knowledge of the Slope Ordinance, a public statute, and such statutes constitute no breach of the covenant against encumbrances. Furthermore, we would be hard pressed to conclude that a building restriction, such as the Slope Ordinance, qualifies as an "interest in a third person" under the more modern definition of encumbrance. *See Holmes Dev., LLC*, 2002 UT 38 at ¶ 44, 48 P.3d 895 (quotations and citation omitted). Therefore, Plaintiff's claim for breach of warranty fails as a matter of law, and we affirm the trial court's grant of summary judgment in favor of Madsen.

## C. Breach of the Implied Warranty of Fitness for Purpose

¶ 47 Plaintiff's final claim is that Madsen breached the implied warranty of fitness for a particular purpose because the Slope Ordinance rendered Lot 13 unfit for the purpose for which it was sold—to build a residence.

¶ 48 This claim fails as a matter of law because Utah does not recognize an implied warranty of fitness in the context of purchasers of residential real property. *See Snow Flower Homeowners Ass'n v. Snow Flower, Ltd.*, 2001 UT App 207, ¶ 30, 31 P.3d 576. In *Snow Flower*, we determined that a claim for breach of "an implied warranty of fitness ... [is] indistinguishable from a claim for a breach of an implied warranty of habitability." *Id.* at ¶ 28. And, "Utah does not recognize a claim for a breach of the implied warranty of habitability in the context of purchasers of residential property." *Id.* at ¶ 30 (citing *American Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1193–94 (Utah 1996)). Therefore, we affirm the trial court's grant of summary judgment in favor of Madsen on Plaintiff's implied warranty claim.

## CONCLUSION

¶ 49 We reverse summary judgment in favor of the County and remand for such proceedings as may now be appropriate. We affirm summary judgment in favor of Madsen and against Plaintiff.

¶ 50 WE CONCUR: JUDITH M. BILLINGS, Presiding Judge, and NORMAN H. JACKSON, Judge.

---

no indication that a variance from the zoning was possible.).