2011 UT App 309

GEONAN PROPERTIES, LLC, a Utah limited liability company, Plaintiff and Appellee,

v.

PARK–RO–SHE, INC.; BVP Holdings, Ltd., a Nevada limited liability company; Blaine Van Patten, an individual; and Norm Van Patten, an individual, Defendants and Appellants.

No. 20100338–CA.

Court of Appeals of Utah.

Sept. 9, 2011.

Thomas W. Seiler and Jamis M. Gardner, Provo, for Appellants.

Merrill F. Nelson and Justin W. Starr, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and CHRISTIANSEN.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Park–Ro–She, Inc.; BVP Holdings, Ltd.; Blaine Van Patten; and Norm Van Patten (collectively, PRS) appeal the trial court's order granting partial summary judgment in favor of GeoNan Properties, LLC (GeoNan) and denying PRS's motion for partial summary judgment. While we agree with most of the trial court's legal conclusions, we reverse and remand for additional proceedings consistent with this opinion.

## BACKGROUND

¶ 2 On June 4, 2008, GeoNan and PRS entered into a written agreement (the Agreement) regarding the lease of the Park–Ro–She Bottling Plant. The Agreement provided that the parties would "enter into a written lease ... which shall be upon terms and conditions reasonably acceptable to all parties." The Agreement described the real property to be leased (the Leased Property) as "Lot 1, Park–Ro–She Subdivision, according to the official subdivision plat thereof, which real property is located at [965 North Main Street, Springville, Utah]." The Agreement further provided that "[t]he primary term of the Lease shall be for a period of five (5) years," with an option to extend for an additional five years, and described a detailed rent schedule beginning at $30,000 per month and eventually graduating to a rent equal to a percentage of GeoNan's gross revenue. The Agreement also gave GeoNan the option to purchase the Leased Property as well as two adjacent properties (the House Property and the Southeast Property).

¶ 3 Later in June, GeoNan loaned PRS $30,000 to be used to pay PRS's mortgage on the Leased Property (the June loan). Blaine Van Patten executed a promissory note, which stated the parties' intent to enter into a lease agreement and provided that the $30,000 would be applied toward GeoNan's rent under the lease. On June 30, 2008, the parties amended the Agreement to provide that the parties would execute the Lease not later than ten days after Springville City issued a certificate of occupancy certifying that permit conditions had been met. Additionally, the parties acknowledged that the June loan had been an advanced rent payment and agreed that GeoNan would make an additional advanced rent payment when Springville City issued the certificate of occupancy.[1] In August 2008, GeoNan made another loan of $30,000 to PRS (the August loan), despite the fact that the certificate of occupancy had not yet been issued. George A. Hansen, managing member of GeoNan, stated in an affidavit that Blaine Van Patten had promised to sign another promissory note identical to the one signed in June but that Van Patten never signed the note.

¶ 4 Both parties agree that their original intent was to enter into a lease that excluded the Southeast Property. However, sometime in July or August of 2008, the parties discovered that the Southeast Property was not a separate piece of property but actually fell within the legal description of Lot 1.[2] Subsequently, each party provided the other with a proposed lease agreement. These proposals differed significantly with respect to the description of the property to be leased. GeoNan's proposed lease (the GeoNan lease) specifically excluded the Southeast Property from its description of the Leased Property. PRS's proposed lease (the PRS lease) described the Leased Property as the entire

---

1. The Amendment included several additional changes, including slight modifications to the graduation of the rental rate, which are not relevant to the issues on appeal.

2. Although the Agreement defines the "Leased Property" as "Lot 1," we do not use these terms interchangeably in this opinion because "Lot 1" is an inaccurate description of the property the parties actually intended to lease, see supra ¶¶ 2, 4, 11. Therefore, we use the term "Leased Property" to refer to the property the parties intended to lease and the term "Lot 1" to refer to the legally described plot.

Lot 1—which includes both the Leased Property and the Southeast Property—and the House Property. It also provided for a higher rental rate than the rate the parties agreed to in the Agreement, purportedly to compensate for the inclusion of the additional properties in the lease. The two proposals also varied as to how the two $30,000 loans should be credited: the GeoNan lease characterized these loans as "advance rent payments," while the PRS lease provided that they would be applied toward a $180,000 security deposit that was never mentioned in the Agreement. On September 29, 2008, Springville City issued the certificate of occupancy, certifying that the permit conditions had been satisfied. However, the parties failed to sign a final lease agreement.

¶ 5 On October 23, 2008, GeoNan filed a complaint against PRS, alleging (1) breach of the Agreement, (2) breach of the duty of good faith and fair dealing, (3) breach of the promissory note pertaining to the June loan, (4) promissory estoppel with respect to the August loan, (5) fraudulent misrepresentation with respect to the August loan, and (6) unjust enrichment with respect to the June and August loans. GeoNan requested specific performance of the Agreement and damages. PRS counterclaimed, alleging that GeoNan had breached the Agreement and its duty of good faith and fair dealing by refusing to sign the PRS lease and by failing to make the advanced rent payment upon issuance of the certificate of occupancy. PRS also requested a declaratory judgment declaring the Agreement void. PRS moved for partial summary judgment, requesting that the court "enter an order that neither party is in breach." [3] GeoNan filed a cross-motion for summary judgment on all but the fraudulent misrepresentation claim.

¶ 6 On March 8, 2010, the trial court entered a judgment denying PRS's summary judgment motion and granting GeoNan's, concluding that the Agreement was enforceable and that PRS breached it. The trial court awarded GeoNan approximately $1,322,664 in damages for repayment of the

June and August loans, expenses incurred in reliance on the parties' Agreement regarding the lease of the bottling plant, lost profits, and attorney fees. PRS appeals.

## ISSUE AND STANDARD OF REVIEW

■ ¶ 7 PRS argues that the trial court erred by denying its summary judgment motion and granting GeoNan's. We review a trial court's ruling on a summary judgment motion for correctness. *See Bushco v. Utah State Tax Comm'n*, 2009 UT 73, ¶ 8, 225 P.3d 153.

## ANALYSIS

¶ 8 PRS raises several arguments in challenging the trial court's rulings on the parties' summary judgment motions: (1) that the Agreement was unenforceable, (2) that the Agreement failed by its own terms, (3) that any breach by PRS was excused because GeoNan also breached the Agreement, and (4) that the damages awarded were unforeseeable and unreasonable. We address each of these arguments in turn.

### I. Enforceability

¶ 9 First, PRS argues that the Agreement was unenforceable because it was an impermissible agreement to agree and was based on mutual mistake. "A binding contract can exist only where there has been mutual assent by the parties manifesting their intention to be bound by its terms ... [and] the obligations of the parties are set forth with sufficient definiteness that it can be performed." *Brown's Shoe Fit Co. v. Olch*, 955 P.2d 357, 363 (Utah Ct.App.1998) (internal quotation marks omitted). Under the circumstances of this case, we conclude that the Agreement was enforceable.

### A. Definiteness

■ ¶ 10 PRS argues that the Agreement is an unenforceable agreement to agree because it was not sufficiently definite. "An agreement to agree, by reason of its character, is not, per se unenforceable." *Id.* How-

---

**3.** Although PRS requested an order declaring neither party in breach, it maintained that its breach, if any, was excused by GeoNan's failure

to make the advanced rent payment as provided in the Agreement.

ever, "for an agreement to agree to be specifically enforced, it must include sufficiently definite terms and conditions," *id.*, regarding the "essential terms of the contract," *C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 52 (Utah Ct.App.1995) (internal quotation marks omitted). In the context of a lease subject to the statute of frauds, the essential terms are (1) the identity of the property to be leased, (2) the term of the lease, and (3) the rental amount. *See Brown's Shoe*, 955 P.2d at 363.

¶ 11 PRS contests the definiteness of the Agreement only with respect to the first essential term—the identity of the property. PRS argues that the Agreement's erroneous identification of the Southeast Property as a free-standing parcel separate from Lot 1 misstates an essential term of the lease so as to render the Agreement too indefinite to be enforceable. However, the term essential to enforceability is not the legal description of the property, but "the identity of the property," *see id.* at 364. As long as the identification of the property is clear, the manner in which it is identified is irrelevant to enforceability. In this case, the parties agree that they intended for GeoNan to lease Lot 1, less the Southeast Property. Furthermore, the identity of the Leased Property is apparent from the Agreement when it is read as a whole because the Southeast Property is clearly distinguished from the Leased Property in the portion of the Agreement outlining the terms of the purchase option. There is simply no basis for determining that the property was not sufficiently identified to create an enforceable contract.

**4.** PRS argues that the Agreement rested on the assumption that the Southeast Property was either separate from Lot 1 or could be subdivided from Lot 1, as the Agreement included separate purchase options for the Leased Property and the Southeast Property. PRS points out that subdivision of Lot 1 is impossible under a current Springville City zoning ordinance that mandates a minimum lot frontage for Lot 1. *See* Springville, Utah, Mun.Code § 11–4–504 (2011). However, subdivision of Lot 1 is not necessary to the lease, and the potential effect of the zoning laws on the future exercise of the purchase options is not an "existing fact" for which recision on the grounds of mutual mistake is available. *Cf. Arnell v. Salt Lake Cnty. Bd. of Adjustment*, 2005 UT App 165, ¶¶ 40–42, 112 P.3d 1214 (rejecting

### B. Mutual Mistake

¶ 12 PRS next argues that the parties' mutual mistake regarding the legal description of Lot 1 rendered the Agreement unenforceable. "A party may rescind a contract when, at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract." *Mooney v. GR & Assocs.*, 746 P.2d 1174, 1178 (Utah Ct.App.1987) (internal quotation marks omitted). But the legal separation of the Leased Property and the Southeast Property was not a basic assumption on which the contract was based. Neither the terms of the lease nor the ability of the parties to enter into a lease that did not include the Southeast Property depended on whether the Southeast Property was included in the legal description of Lot 1.[4] Thus, the fact that the Southeast Property was not legally distinct from Lot 1 was merely a collateral matter that does not affect the validity of the Agreement, and PRS has no valid basis for rescinding the contract.

¶ 13 PRS also challenges the trial court's conclusion that the parties' mutual mistake in describing the Leased Property in the Agreement merited reformation to conform to the parties' intent. PRS asserts that reformation is available only to correct drafting errors and that reformation is not appropriate in cases of mutual mistake. However, this court has previously listed drafter error as only one of three circumstances where reformation may be appropriate. *See Lloyd's Unlimited v. Nature's Way Mktg., Ltd.*, 753

plaintiff's argument that he should be permitted to rescind a purchase contract for a parcel of land because a zoning ordinance prevented him from obtaining a building permit or variance), *abrogated on other grounds by Davencourt at Pilgrims Landing Homeowners Assoc. v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, ¶¶ 50–55 & n. 6, 221 P.3d 234. The enforceability of the Agreement is not affected by the zoning ordinance because the contract is not contingent on GeoNan's ability to exercise the purchase options and because a variance from the zoning ordinance is "theoretically possible." *Cf. id.* ¶ 42. *See generally* Springville, Utah, Mun.Code § 11–2–306 (providing rules for obtaining a zoning variance).

P.2d 507, 511 (Utah Ct.App.1988). Another circumstance where we have explicitly acknowledged the availability of reformation is when "the instrument does not embody the intentions of both parties to the contract, a mutual mistake has occurred, and reformation is appropriate." *Id.* (internal quotation marks omitted); *see also Peterson v. Coca-Cola USA Operations,* 2002 UT 42, ¶ 19, 48 P.3d 941 (stating that "[m]utual mistake warrants the reformation of written instruments" where "the instrument as made failed to conform to what both parties intended" (internal quotation marks omitted)). That is precisely the situation here. It is apparent, even on the face of the instrument, that the parties intended to exclude the Southeast Property from the Leased Property, so it is entirely appropriate for the Agreement to be reformed to clarify that point in the description of the Leased Property and for the lease to reflect that reformation. *Cf. Booth v. Wilkinson,* 195 Neb. 730, 240 N.W.2d 578, 580 (1976) ("[W]here there is no mistake as to the identity of the land intended to be conveyed, but there is a mistake in the description of it, equity may reform the instrument to conform to the true intention of the parties." (internal quotation marks omitted)). Thus, PRS cannot avoid the contract on grounds of mutual mistake.

## II. Failure to Sign the Lease

¶ 14 Next, PRS argues that even if the Agreement were enforceable, it failed by its own terms because the parties failed to comply with a provision of the Agreement requiring them to "execute the Lease not later than ten (10) days after" the certificate of occupancy was issued. However, the Agreement also provided that the parties intended for the Agreement to be binding upon them until superceded by the appropriate lease documents and stated that "Geo-Nan *shall,* upon terms and conditions set forth below, lease from [PRS] the real property described in this section." (Emphasis added.) There is nothing in the Agreement to suggest that the signing of the lease was a condition precedent to the Agreement becoming binding. The Agreement itself served to enforce the essential terms of the parties' agreement, even while they failed to reach an agreement regarding ancillary terms in the lease. *See* Restatement (Second) of Contracts § 33 cmt. a (1981) ("Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract."). PRS's assertion that it could avoid its contractual obligations under the Agreement by simply refusing to sign a final lease is unreasonable.

¶ 15 PRS further argues that its failure to sign a lease was not a breach of the Agreement because the GeoNan lease contained additional terms that the parties had not agreed to. However, the additional terms contained in the GeoNan lease did not alter the essential terms of the Agreement.[5] Certainly some additional good faith negotiations may have been necessary to resolve some of the ancillary terms in the lease agreement. However, PRS's response to the GeoNan lease was not a good faith negotiation of the collateral terms. Rather, the PRS lease attempted to modify the essential terms of the Agreement, namely, the property to be leased and the rental rate. It was PRS's refusal to sign a lease complying with the essential terms of the Agreement that ultimately led to the demise of the parties' contract. Thus, we agree with the trial court that PRS breached the Agreement by refusing to either sign the GeoNan lease or negotiate it in good faith.

## III. GeoNan's Performance

¶ 16 We next address PRS's argument that the trial court erred in granting GeoNan's motion for summary judgment with respect to PRS's breach of contract counterclaims, which rest on its assertion that GeoNan breached the contract by failing to make a required advanced rent payment when the certificate of occupancy was issued. GeoNan claims that the August loan was subject to the same terms as the June loan

---

5. In fact, there is at least some evidence that the parties had previously discussed and agreed to incorporate these terms into the lease.

and therefore constituted advanced rent. However, a promissory note incorporating these terms was never signed. PRS claims that the August loan was a separate loan with no relationship to GeoNan's contractual obligation to pay the advanced rent when the certificate of occupancy was issued. This understanding is reflected in the PRS lease, which applies the August loan toward a security deposit. We agree that this dispute of fact precluded summary judgment on PRS's breach of contract counterclaims. *See generally* Utah R. Civ. P. 56(c) (providing that summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law").

¶ 17 We therefore reverse and remand for the trial court to determine (1) whether the parties intended for the August loan to fulfill GeoNan's obligation to make an advanced rent payment upon issuance of the certificate of occupancy and (2) if the loan did not fulfill that obligation, whether GeoNan's failure to make the advanced rent payment was a material breach of the Agreement that would permit PRS to disavow the Agreement.[6] If the trial court determines that the August loan was not intended to constitute advanced rent and that GeoNan's failure to make an additional payment when the certifi-

cate of occupancy was issued was a material breach of the Agreement, then GeoNan cannot recover for the subsequent breach by PRS. *See Orlob v. Wasatch Med. Mgmt.,* 2005 UT App 430, ¶ 26, 124 P.3d 269 ("It is well-settled law that one party's breach excuses further performance by the non-breaching party if the breach is material."). However, because we determine that the trial court properly granted GeoNan's motion for summary judgment on the remaining issues, the trial court's award of damages to GeoNan, which we discuss in the next section, *see infra* ¶¶ 18–20, should be reinstated with appropriate adjustments owing to the passage of time and fees on appeal, *see infra* ¶ 21, if it finds either that GeoNan did not breach the Agreement or that the breach was immaterial.

## IV. Damages

¶ 18 Finally, PRS argues that the damages claimed by GeoNan were unforeseeable, unreasonable, and unnecessary.[7] *See generally Ranch Homes, Inc. v. Greater Park City Corp.,* 592 P.2d 620, 624 (Utah 1979) ("[T]he damages to be awarded for breach of contract are those that are foreseeable as a natural and probable consequence of the breach."). Primarily, PRS contends that it cannot be held liable for expenses

---

6. The determination of whether a contractual breach is material is a question of fact, *see Wilson v. Johnson,* 2010 UT App 137, ¶ 25, 234 P.3d 1156, *cert. denied,* 241 P.3d 771 (Utah 2010), which depends on a number of factors:

> "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing,"

*Cache Cnty. v. Beus,* 1999 UT App 134, ¶ 37, 978 P.2d 1043 (quoting Restatement (Second) of Contracts § 241 (1981)).

7. PRS also claims that approximately $500,000 of the damages requested by GeoNan were "spe-

cial damages" that were not appropriately pleaded in GeoNan's complaint. *See generally* Utah R. Civ. P. 9(g) ("When items of special damage are claimed, they shall be specifically stated."); *Prince v. Peterson,* 538 P.2d 1325, 1328 (Utah 1975) ("[G]eneral damages are those which, from the common sense and experience of mankind, would naturally be expected to result from that type of a wrong to any person so injured[, w]hereas, 'special damages' means particular items of damages which result from circumstances peculiar to the case at hand."); *Cohn v. J.C. Penney Co.,* 537 P.2d 306, 308 (Utah 1975) ("[S]pecial damages must be pleaded, and it is error to admit proof of such damages in the absence of such allegation." (internal quotation marks omitted)). However, PRS's briefing of this issue is inadequate, as it fails to identify which of the damages awarded should have been classified and pleaded as special damages or to explain why. *See generally State v. Thomas,* 961 P.2d 299, 305 (Utah 1998) (stating that an issue is inadequately briefed "when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court").

incurred by GeoNan to prepare architectural and engineering plans, to hire a contractor, to purchase equipment, and to investigate the site before a lease was signed. In support of its argument, PRS refers us to the Utah Supreme Court's holding in *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620 (Utah 1979), in which the court held that extensive expenditures on such things as architectural and engineering plans made by a party in anticipation of exercising an option to purchase were not recoverable under the purchase option agreement. *See id.* at 625. However, the *Ranch Homes* court specifically distinguished the option contract at issue in that case from a typical contract containing mutual obligations, pointing out that until the option was exercised, it was only a unilateral contract under which one party had the obligation to enter a future contract and the other did not. *See id.* The court stated that in the case of an option contract, "the parties [may] incur no more expenses than are absolutely necessary and that . . . reflect only what is required to be done before the option can be exercised." *Id.* The court emphasized that "until the option is exercised, no contract is in existence" and concluded that until the parties actually entered into a purchase contract, the seller could not be liable for the expenses the buyer incurred in preparing to use and develop the land. *See id.*

¶ 19 *Ranch Homes* is clearly distinguishable from the case at hand because the Agreement was a mutual contract under which both parties were obligated to enter into a lease. Unlike the option at issue in *Ranch Homes*, under which the ultimate purchase of the property was uncertain, the Agreement itself was a binding contract containing the essential terms of the parties' agreement, with or without a signed lease. The lease itself would have done nothing to increase the enforceability of the essential terms of the contract—i.e., the property to be leased, the term of the lease, and the rental rate—which were contained in the binding Agreement. Rather, those terms became enforceable upon the signing of the Agreement, and actions taken in reliance on that agreement were just as reasonable under the terms of the Agreement as under the terms of the eventual lease. Given the par-

ties' clear intent for their Agreement to become binding when signed, *see supra* ¶ 14, it was not unforeseeable that GeoNan would rely on the parties' contract by making significant expenditures in preparing to occupy the bottling plant.

¶ 20 Because PRS has not challenged any of the specific damages claimed by GeoNan, apart from its general argument that expenditures made in preparing to occupy the bottling plant were unforeseeable, unreasonable, and unnecessary, we do not consider this matter further. However, on remand the damages award must be vacated if the trial court determines that PRS was entitled to repudiate the contract based on the analysis outlined *supra* ¶ 17 & note 6.

## V. Fees on Appeal

¶ 21 Finally, GeoNan requests an award of attorney fees on appeal. The parties' contract provides, "If either party defaults in the performance of any obligation under this Agreement . . . the defaulting party shall reimburse the non-defaulting party for all costs and attorneys' fees incurred arising out [of] or resulting from such default, [including] . . . on appeal. . . ." While we have concluded that PRS breached the contract by failing to enter into the lease on the agreed terms, the question remains whether PRS's obligation to enter into the lease was excused by a breach of the Agreement by GeoNan. *See supra* ¶¶ 16–17. Thus, we award GeoNan its fees on appeal, to be calculated by the trial court, but this award shall be automatically vacated if the trial court determines on remand that PRS's breach was excused.

## CONCLUSION

¶ 22 We affirm the trial court's conclusions regarding the enforceability of the Agreement and PRS's breach. Furthermore, we conclude that the expenses incurred by GeoNan in anticipation of the lease were foreseeable and reasonable and were therefore recoverable as damages resulting from the breach. However, because the trial court erred in concluding that there was no genuine issue of material fact as to the question of

whether GeoNan's failure to make an additional payment of advanced rent upon issuance of the certificate of occupancy was a material breach of the Agreement, we reverse and remand for resolution of that factual issue. Should that issue be decided in GeoNan's favor, summary judgment may be entered against PRS and the judgment for damages may be reinstated. However, should the fact-finder conclude that GeoNan materially breached the contract prior to PRS's breach, then GeoNan's recovery must be limited to repayment of the June and August loans, and the trial court may award PRS such damages and attorney fees as may have been incurred as a result of GeoNan's breach. Furthermore, we award GeoNan its attorney fees on appeal, which award shall be vacated if GeoNan does not prevail on remand.

¶ 23 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and MICHELE M. CHRISTIANSEN, Judge.